IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---o0o---


UNITED STATES OF AMERICA,

                Plaintiff,

vs.                              No. Cr.S. 08-0269

JOEL BLANFORD,

                Defendant.
_____/

---o0o---

REPORTER'S PARTIAL TRANSCRIPT

EVIDENTIARY HEARING

ON DEFENDANT'S MOTION TO SUPPRESS

VOLUME 1

WEDNESDAY, JUNE 16, 2010

---o0o---


Reported by:    KATHY L. SWINHART, CSR #10150

```
 1                              APPEARANCES

 2

 3      For the Plaintiff:

 4              BENJAMIN B. WAGNER
                United States Attorney
 5              501 I Street, Suite 10-100
                Sacramento, California  95814
 6              BY:    LAUREL LOOMIS RIMON
                       PAUL A. HEMESATH
 7                     Assistant U.S. Attorneys

 8

        For the Defendant:
 9

10              THE CARDOZA LAW OFFICES
                1220 Oakland Boulevard, Suite 200
10              Walnut Creek, California  94596
                BY:    MICHAEL E. CARDOZA
11              and    JYOTI K. REKHI

12              Also Present:

13                     JOEL BLANFORD

14                     CHRIS FITZPATRICK
15                     Federal Bureau of Investigation

16

17

18

19

20

21

22

23

24

25
```

1                                  INDEX

2

3    DEFENDANT WITNESSES:                                    PAGE:

4    FITZPATRICK, CHRIS

5    DIRECT EXAMINATION BY MS. REKHI                            5
     CROSS-EXAMINATION BY MS. RIMON                            26
6    REDIRECT EXAMINATION BY MS. REKHI                         32

7

     BLANFORD, JOEL
8
     DIRECT EXAMINATION BY MS. REKHI                          35
9    CROSS-EXAMINATION BY MS. RIMON                           45

10

     GOVERNMENT WITNESSES:                                   PAGE:
11

12   SOMMERCAMP, JOHN

13   DIRECT EXAMINATION BY MS. RIMON                          55
     CROSS-EXAMINATION BY MS. REKHI                           64
14

15

16

17

18

19

20

21

22

23

24

25

1                    GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

2     NO.:                        DESCRIPTION:                    PAGE:

3

4     100     Consent form signed by defendant                    51

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2          WEDNESDAY, JUNE 16, 2010, 9:03 A.M.

3                    ---o0o---

4          (The following proceedings were had outside

5          the presence of the prospective jurors:)

6          THE COURT:  We're meeting outside the presence of the

7     jury.  The defendant is present with counsel.  This is the

8     time for the evidentiary hearing on defendant's motion to

9     suppress the statements.

10         Can I have a clarification from you, is it, Ms. Rekhi?

11         MS. REKHI:  Yes.

12         THE COURT:  You're handling this motion?

13         MS. REKHI:  Yes.

14         THE COURT:  Are you moving to suppress statements that

15    were made in the home as well as statements that were made

16    later in the car?  Or are you just moving to suppress

17    statements made in the home?  And if it's both, tell me what

18    the statements are that you're moving to suppress.

19         MS. REKHI:  Your Honor, in the statements at the home,

20    there's allegedly a confession from the defendant that he was

21    aware that Ngo was committing fraud and that he turned a blind

22    eye to the fraud.

23         Then later on he was driven to Benicia where the

24    agents had him conduct a pretext call to a former employee of

25    WAMU, a Chris Tom.  And in this pretext call there are

1   statements made along the lines you know we were paying Ngo to

2   turn a blind eye, statements of the sort.  And in the

3   government's brief, they have indicated that they're going to

4   introduce these statements as admissions of the defendant.

5         THE COURT:  Well, I think there are separate issues

6   here, and that's why I asked you the question.

7         The government seems to have acknowledged that there

8   was interrogation, and the only issue that they seem to raise

9   is whether the defendant was in custody.  When he makes a

10  pretext call, even if the government wants to admit it, I have

11  a hard time with a straight face saying that was

12  interrogation.  And it's also not even an admission.  He's

13  saying things because the government told him to say them.

14        MS. REKHI:  Yes.

15        THE COURT:  All right.  I'm going to suppress that

16  because it's not even a statement by him, it's a statement

17  that he made to somebody else playing a role.

18        MS. REKHI:  Yes.

19        THE COURT:  Fine.  That's suppressed.  So let's just

20  talk about -- let's have the evidentiary hearing on the

21  statements made in the home.

22        MS. RIMON:  Your Honor?

23        THE COURT:  Yes.

24        MS. RIMON:  I'd like to be heard on the issue of the

25  call before we start the rest.

1          I think the evidentiary hearing may shed some light on

2     that as well.  I don't think the record shows that those

3     statements that were made by Mr. Blanford in that call were

4     scripted or were word for word provided to him by the

5     government.  And so I think that an evidentiary hearing, if

6     we're going to have one, would relate to that as well.

7          THE COURT:  All right.  Do you admit that's

8     interrogation?  I really have a hard time with a straight face

9     making a finding that that was interrogation.

10          MS. RIMON:  No, I don't think it's necessarily

11     interrogation.

12          THE COURT:  So why don't you argue that it's not

13     interrogation?

14          MS. RIMON:  Your Honor, we're not saying it was

15     interrogation.  I think what we have been talking about mostly

16     are the statements that are -- that were in the home.

17          THE COURT:  That's what I thought we were talking

18     about.  I'll have the hearing on that.  The --

19          MS. RIMON:  But, Your Honor, if I may be heard.  I'd

20     like to state for the record at least the government's

21     objection to the hearing, and we've had little time to

22     respond, and it hasn't been timely filed.  It was filed as a

23     motion in limine.  It's actually a motion to suppress, which

24     is a pre-trial motion that should have been filed under

25     Federal Rule of Criminal Procedure 12 and Local Rule 430.1 at

1   least seven days prior to the trial confirmation hearing.

2           These are statements that were made over two and a

3   half years ago, and so we've had very little time to address

4   them fully.  As the Court is aware, the defendant's initial

5   motion was not more than a boilerplate motion alleging

6   practically no information allowing the government to fully

7   respond and develop its answers to the motion.

8           So it may be that because of the short time frame and

9   the -- the untimely filing of the motion that these issues are

10  getting a little bit mixed up.

11          THE COURT:  Well, let's go ahead with the hearing on

12  the statements that were made in the home.

13          MS. RIMON:  Your Honor, it's the defendant's motion.

14          THE COURT:  Who wants to proceed?

15          MS. REKHI:  Your Honor, if I could make a motion to

16  exclude witnesses.

17          THE COURT:  All witnesses in this case are excluded

18  from the courtroom with the exception of the defendant and the

19  case agent.  Who is the case agent?

20          MS. RIMON:  Agent Chris Fitzpatrick at the table.

21          THE COURT:  All right.  Mr. Fitzpatrick may remain,

22  and Mr. Blanford may remain.  Otherwise all witnesses are

23  ordered to leave the courtroom.

24          You may call your first witness.

25          MS. REKHI:  The defense would like to call Agent

1    Fitzpatrick.

2            THE CLERK:  Please step in front of the Court Reporter

3    and raise your right hand.  Right here, please.  Raise your

4    right hand.

5                         CHRIS FITZPATRICK,

6    a witness called by the Defendant, having been first duly

7    sworn by the Clerk to tell the truth, the whole truth, and

8    nothing but the truth, testified as follows:

9            THE WITNESS:  I do.

10           THE CLERK:  Thank you.  You may be seated.

11           Please state your full name and spell your last name

12   for the record.

13           THE WITNESS:  Chris Fitzpatrick,

14   F-I-T-Z-P-A-T-R-I-C-K.

15                      DIRECT EXAMINATION

16   BY MS. REKHI:

17   Q.      Good morning, Agent Fitzpatrick.  How are you today?

18   A.      Good morning.

19   Q.      Do you remember what happened on December 4th, 2007?

20   A.      Yes.

21   Q.      Do you remember arriving at Mr. Blanford's residence?

22   A.      Yes.

23   Q.      What time was that at?

24   A.      Sometime before noon.

25   Q.      And prior to that you had already conducted a pretext

1    call to him with John Ngo, correct?

2    A.       Correct.

3    Q.       So you were aware that the defendant was home?

4    A.       Correct.

5    Q.       And you were aware that he had an injured back?

6    A.       I wasn't aware that he had an injured back.  He was

7    complaining in the call he had back pain.

8    Q.       And you knew he had taken the day off from work and he

9    was home that day?

10   A.       I knew he was home that day.  I don't know if he took

11   off work.  I don't know if he was supposed to work that day or

12   not.

13   Q.       Okay.  And you arrived at his residence around noon

14   with Agent Sommercamp, correct?

15   A.       That's correct.

16   Q.       And you were armed?

17   A.       Yes.

18   Q.       And you flashed your FBI badge with Agent Sommercamp

19   when you announced your presence at the door, correct?

20   A.       No.

21   Q.       No?

22   A.       No.

23   Q.       What did you do?

24   A.       I'm a special agent for the IRS criminal division, not

25   the FBI.  When we went to the front door, Agent Sommercamp

```
 1    produced his credentials, who is an FBI agent, and asked Mr.

 2    Blanford at the time for an interview.

 3    Q.      And did you flash any credentials?

 4    A.      Not at that point, no.

 5    Q.      Did you at this point, when you initiated --

 6            THE COURT:  Can I ask about the credentials.  Do they

 7    have a badge with them?

 8            THE WITNESS:  Agent Sommercamp's credentials do not

 9    have a badge with them, no.

10            THE COURT:  They don't?

11            THE WITNESS:  No.  However, he does have a badge on

12    his waistband next to his weapon.

13    Q.      BY MS. REKHI:  So did he flash that badge?

14    A.      No.

15    Q.      He just announced his credentials?

16    A.      He showed his credentials to Mr. Blanford, identified

17    himself as being an agent with the FBI.

18    Q.      And how did you identify yourself?

19    A.      He identified myself.  He said this is my partner

20    Chris Fitzpatrick with the IRS.

21    Q.      Now at this point, when Mr. Blanford opens the door,

22    what is he wearing?

23    A.      I believe, like, sweats and a T-shirt.

24    Q.      Okay.  And you told him that you wanted to ask him

25    some questions?
```

1   A.      Agent John Sommercamp did.

2   Q.      Agent Sommercamp announced to him that he wanted to

3   ask him some questions?

4   A.      Yes.  He asked -- he identified himself, he's an FBI

5   agent working on a mortgage fraud investigation.

6           THE COURT:  If you don't talk slower, we're never

7   going to have a record of this.

8           THE WITNESS:  I'm sorry.  I apologize.

9           Agent Sommercamp identified himself.

10          MS. REKHI:  Okay.

11          THE WITNESS:  He indicated that he's an FBI agent.  He

12  showed his credentials.  He asked Mr. Blanford if he had time

13  this morning to answer some questions, that we were

14  investigating a mortgage fraud case.

15  Q.      BY MS. REKHI:  Did you or Agent Sommercamp at this

16  point inform Mr. Blanford that he did not have to speak with

17  you guys?

18  A.      No.

19  Q.      Did you at any point during this whole interrogation

20  inform Mr. Blanford that he did not have to speak with either

21  of you?

22  A.      It wasn't an interrogation, it was an interview.

23  Q.      Did you at any point inform either Mr. Blanford -- did

24  you or either Sommercamp --

25          THE COURT:  Tell me the difference between an

1    interrogation and an interview.  I'd like to be enlightened.

2              THE WITNESS:  To me an interrogation is -- my belief

3    is when someone is in custody, and you're interrogating them.

4              THE COURT:  What's interrogation?

5              THE WITNESS:  Umm, I guess an interrogation would

6    be -- I don't know.  I would have to give it some thought.

7              THE COURT:  Okay.  That's what I thought.  Go ahead.

8    Q.      BY MS. REKHI:  Now, it is correct that at no point

9    during the interrogation you advised Mr. Blanford that he did

10   not have to speak with you.

11   A.      No.

12   Q.      Yes -- no, correct?

13   A.      No.

14   Q.      You proceeded with Agent Fitzpatrick into the

15   residence, correct?

16             THE COURT:  No, he's Fitzpatrick.

17             MS. REKHI:  I'm sorry.  With Agent Sommercamp into the

18   residence.

19             THE WITNESS:  Yes.  We were invited into his

20   residence.

21   Q.      BY MS. REKHI:  And at this point, he is by himself,

22   Mr. Blanford?

23   A.      Yes.

24   Q.      Were you sat down at the -- in the formal dining room

25   area of the residence?

1   A.      Yes, we were led to that area by Mr. Blanford.

2   Q.      Okay.  Now, you initially asked him some questions

3   regarding mortgage fraud or the mortgage business, correct?

4   A.      Correct.

5   Q.      And his role at Long Beach?

6   A.      Correct.

7   Q.      His job responsibilities and so forth?

8   A.      Correct.

9   Q.      And then you questioned him about John Ngo, correct?

10  A.      There was other questions before that.

11  Q.      At some point, you questioned him about John Ngo,

12  correct?

13  A.      Correct.

14  Q.      And you had already been -- you were already aware

15  that Mr. Blanford had spoken with John Ngo that day, correct?

16  A.      That's correct.

17  Q.      You started accusing him of lying?

18  A.      I had asked Mr. Blanford when was the last time he had

19  spoken to John.

20  Q.      I'm sorry.  That's not what I asked you.

21          Did you accuse him of lying?

22  A.      Yes, I did.

23  Q.      And you accused him repeatedly, correct?

24  A.      No.

25  Q.      Did Agent Sommercamp accuse him of lying as well?

1   A.        I don't recall.

2   Q.        Now, when Mr. Blanford denied that he had not spoken

3   with John Ngo, you again accused him of lying, correct?

4   A.        That was the first time I accused him of lying.  After

5   that comment, I had asked him the last time he spoke to John

6   Ngo.  He had said it had been a month ago when it had been

7   that morning.  At that point in time I did confront him about

8   his lying.

9   Q.        Okay.  And then you further started questioning him

10  about John Ngo and his -- his -- the fraud that he had

11  conducted, correct?

12  A.        No.  After we confronted him with the lie, we produced

13  a copy of a criminal complaint and arrest warrant informing

14  Mr. Blanford that we knew he had not been truthful that

15  morning.

16  Q.        So you started flashing him with evidence of John Ngo

17  being charged with a crime?

18  A.        Informing him that Mr. Ngo had been arrested for

19  lying.

20  Q.        Why was that relevant for Mr. Blanford?

21  A.        We wanted to show him that Mr. Ngo had been

22  cooperating with the government and that we knew he had been

23  lying to us twice that morning before.

24  Q.        Okay.  So at this point, did you tell Mr. Blanford

25  that he did not have to speak with you?

1    A.       No.

2    Q.       Did you tell him that whatever statements he was

3    making would be considered voluntary?

4    A.       No.

5    Q.       So at this point, did Mr. Blanford request for an

6    attorney?

7    A.       No.

8    Q.       During this conversation, did Mr. Blanford request an

9    attorney?  At the residence.

10   A.       He at some point in time I believe asked, Should I get

11   an attorney?

12   Q.       And -- and you responded, no, that it would only slow

13   things down?

14   A.       I said it was his constitutional right to have an

15   attorney, but based upon my experience attorneys slow things

16   down.

17   Q.       You told him based upon his constitutional right, he

18   had the right to an attorney, but it would only slow things

19   down?

20   A.       I said that, yes, he had a right to an attorney --

21            THE COURT:  When did this conversation take place

22   during the course of the events that day?  While you were

23   still in the home?

24            THE WITNESS:  Yes.

25   Q.       BY MS. REKHI:  But you told him that it would only

1   slow things down?

2   A.      I believe I said that, yes.

3   Q.      Now, during this time when you're asking him about

4   John Ngo and informing him about the complaint that had been

5   filed against John Ngo, were you seated directly across from

6   him?

7   A.      Yes.

8   Q.      And you stayed within close proximity to the defendant

9   during this whole conversation, correct?

10  A.      Yes.  We sat where he directed us to sit when we came

11  to the front door, and he escorted us to this area to be

12  interviewed.

13  Q.      So you're in between the defendant and the door,

14  correct, the main exit to the house?  You're seated on one

15  side of the table with Mr. Blanford on the other side, and

16  you're in between him and the exit way, correct?

17  A.      Well, there's multiple exits I believe in the home,

18  but I think, yes, by the front door, yes.

19  Q.      Okay.  Now, when you questioned him about John Ngo,

20  did you tell him that he was going to take the fall for all of

21  this?

22  A.      I don't recall saying that.

23          THE COURT:  Did the statement that he had the right to

24  an attorney but it would only slow things down take place

25  before or after you questioned him?

1      THE WITNESS:  About what?  Before the start of the

2  interview?

3      THE COURT:  I need to know from you, counsel, each and

4  every statement that you want suppressed, and I need to know

5  when it was made during the course of this interview.  Because

6  I need to know whether these statements were made before or

7  after he asked about an attorney and was given the response

8  that Mr. Fitzpatrick has indicated.

9      MS. REKHI:  Your Honor, specifically it's all the

10  statements, but I believe that the point where the -- where he

11  was informed about the attorney is when the questioning

12  regarding Ngo begins.

13      So everything --

14      THE COURT:  You're going to have to give me a list of

15  every statement that you want suppressed, and I'm going to

16  have to know when that statement was made during the course of

17  this interview in relation to this inquiry about an attorney.

18      MS. REKHI:  I can read you the questions that were

19  asked to him and his responses, and those would be all the

20  statements that I'm seeking to be suppressed.

21      THE COURT:  And is that going to be the order in which

22  the questions were asked and answered?

23      MS. REKHI:  I can ask Agent Fitzpatrick if that's the

24  order the questions were asked in.

25      THE COURT:  All right.

1    Q.     BY MS. REKHI:  Now, you informed Mr. Blanford that it

2    was -- that he -- you knew he was not telling the truth,

3    correct?

4    A.     Yes, we did.

5    Q.     And at this point, he asked if he could speak with an

6    attorney.

7    A.     He didn't ask to speak to an attorney.  He asked if he

8    should get an attorney.

9    Q.     And at this point, that's what he asked you, correct?

10   A.     I believe so.

11          THE COURT:  Okay.  Now, are any of the admissions that

12   the government is offering made before that conversation about

13   an attorney?  Or are they all made after that conversation?

14          MS. REKHI:  All the admissions regarding his

15   conversations with Ngo and interaction with Ngo were made

16   after this.

17          THE COURT:  All right.  Thank you.

18          MS. REKHI:  Just one second, Your Honor.

19   Q.     Now, at this point, when he asked for an attorney, you

20   showed him a copy --

21          THE COURT:  No, he didn't ask for an attorney.  He

22   asked if he should get an attorney, and the response made was

23   he had the right to an attorney, but in the agent's experience

24   it would only slow things down.  Now, you can make your own

25   judgment as to whether that helps you or hurts you at this

```
 1   point.  I just want to make sure I understand the facts.

 2              MS. REKHI:  Yes.

 3   Q.      Then you informed him that -- you showed him the

 4   criminal complaint against John Ngo, correct?

 5   A.      After Mr. Blanford made his second lie to us, at that

 6   point we confronted him with his lie and we showed him the

 7   criminal complaint.

 8   Q.      And then you asked him about the fraud conducted by

 9   Ngo, correct?

10   A.      About Ngo and then him perpetrating fraud.

11   Q.      And he denied any involvement in the fraud, correct?

12   A.      No, that's not true.

13   Q.      He admitted involvement in the fraud?

14   A.      Yes.

15   Q.      And you asked him what type of fraudulent documents

16   Ngo had created?

17   A.      That's one of the questions, yes.

18   Q.      And the -- Mr. Blanford informed you that he believed

19   Ngo had created canceled checks and form W-2s?

20   A.      Correct.

21   Q.      He didn't tell you that he committed -- or he altered

22   any of these documents, correct?

23   A.      Correct.

24   Q.      Then you asked him or -- you believe Blanford told you

25   that Ngo created fraudulent documents because some loans were
```

slated to be closed, but for unexplained reasons Ngo was able to get the conditions approved?

A. That's what he said, yes.

THE COURT REPORTER: I need you to slow down, please.

MS. REKHI: I apologize.

Q. Now, Blanford denied any involvement with Bill Bridge, correct?

A. That's not correct.

Q. What did he tell you?

A. I believe he said in 2003 he informed Bill Bridge that he had someone on the inside that can get loans through.

Q. Now, were you threatening him at this point that he was going to take the fall for all the -- all this fraud?

A. I never threatened him.

Q. Did you make any statements of the sort?

A. I don't believe so, no.

Q. Did you tell him that if he didn't cooperate with the goverment, he was against the government?

A. I don't believe -- I don't recall saying that.

Q. Did Agent Sommercamp say that to him?

A. I don't recall him saying that either.

Q. Now, how long did this questioning at the dining table last for?

A. Approximately 45 minutes.

Q. And at some point you told him that he had to conduct

1   a pretext call, correct?

2   A.      No, we never told him to.  He voluntarily decided to

3   place a pretext call.

4   Q.      Did you tell him we want you to conduct a pretext

5   call?

6   A.      We asked him if he'd be willing to place a pretext

7   call at the conclusion of the interview.

8   Q.      And then you --

9          MS. REKHI:  Your Honor, if I may clarify.  Do you want

10  me to go into this area as you've already indicated that you

11  would be suppressing these pretext calls?

12         THE COURT:  Is there more than one pretext call?

13         MS. REKHI:  It's just this one pretext call.

14         MS. RIMON:  Your Honor --

15         THE COURT:  I just don't -- I'll hear what the lawyers

16  have to say, but maybe you want to ask him some questions

17  then, because the government wants to be heard on this

18  question.  My initial reaction to it is when it's a pretext

19  call, that's what it is, pretext, that's the definition of it.

20  It may not be scripted, but it's not an admission.

21  Q.      BY MS. REKHI:  Agent Fitzpatrick, at some point you

22  told Mr. Blanford if he would conduct a pretext call.

23  A.      No, I asked him.

24  Q.      You asked him?

25  A.      Yes.

1    Q.      And did you advise him that he did not have to conduct

2    this pretext call?

3    A.      He knew it was voluntary, yes.

4    Q.      How did you advise him of that?

5    A.      Well, when you're asking someone, it's asking.  You're

6    not telling the person --

7    Q.      Let me stop you.

8            Did you say to him, if you conduct this pretext call,

9    it is voluntary?

10   A.      I don't believe we used those words, no.

11   Q.      Did you say anything along those lines?

12   A.      No.  However, he signed a consent form --

13   Q.      I will get to that.

14   A.      Okay.

15   Q.      At this point, you told him that he would drive to

16   Benicia, correct?

17   A.      No, we asked -- we gave him the opportunity to ride in

18   our car, and at that point in time he said he'd like to take

19   his own car.

20   Q.      He told you that he would like to take his own car?

21   A.      Correct.

22   Q.      And he gets in his vehicle at some point after this,

23   correct?

24   A.      Are you talking about after the call or before the

25   call?

1    Q.      Before the call.

2    A.      Yes.

3    Q.      And you are waiting outside of his residence in your

4    own vehicle, correct?

5    A.      Yes.

6    Q.      And you follow him for the 30-minute drive from Mr.

7    Blanford's residence to Benicia, correct?

8    A.      No, he follows us in our car behind us to Benicia.

9    Q.      So he's behind you?

10   A.      Correct.

11   Q.      And you drive to Benicia.  You pull into a parking lot

12   or you direct where to pull into, where to stop?

13   A.      I wasn't driving, Agent Sommercamp was driving.  But

14   we pulled off the freeway into a park and ride location.

15   Q.      And you directed Mr. Blanford to pull in next to you

16   or --

17   A.      He just followed -- he was following us from his

18   residence to the park and ride location.  So when we pulled in

19   the parking lot, he just followed us into the parking lot.

20   Q.      Now, why did you decide to go to Benicia?

21   A.      Because Agent Sommercamp had permission to conduct the

22   call only in the Eastern District of California since -- well,

23   the FBI is broken down into different divisions.  He only had

24   consent to do the call in the Sacramento division, which is

25   located in Benicia, not to do the recording in San Ramon.

1    Q.      So couldn't you have told Mr. Blanford knowing that he

2    was in pain that, hey, you know, come on down another day and

3    we'll do this some other day when you feel better?  You never

4    told him that, correct?

5    A.      I never said those words to him, no.

6    Q.      You never gave him an option to come in to conduct a

7    pretext call on another day?

8    A.      No, we asked him that morning at the conclusion of the

9    interview if he'd be willing to make a phone call, and he said

10   yes.  He voluntarily left his residence, followed us to the

11   location to make the phone call.

12   Q.      Okay.  Now, when you arrived at the location, you had

13   Mr. Blanford get out of his car and get into your vehicle,

14   correct?

15   A.      We placed the, yes, recording -- the call from Agent

16   Sommercamp's car.

17   Q.      And so you're sitting in the rear passenger seat; is

18   that correct?

19   A.      That's correct.

20   Q.      While this -- while the equipment is being set up?

21   A.      Yes.

22   Q.      And Mr. Blanford is sitting in the front passenger

23   seat?

24   A.      Correct.

25   Q.      And Agent Sommercamp is in the driver's seat?

1   A.        Correct.

2   Q.        And Agent Sommercamp is also armed, correct?

3   A.        We're both armed, yes.

4   Q.        Now, you had him conduct this pretext call.  Were you

5   writing down any words, specific words or language for Mr.

6   Blanford to use?

7   A.        I don't recall.

8   Q.        Was Agent Sommercamp writing down any specific words

9   or language for Mr. Blanford to use?

10  A.        I don't recall.

11  Q.        Now, do you remember giving him certain words to use

12  in the pretext call?

13  A.        I don't recall.  But typically when we do pretext

14  calls, depending on the situation, we may inform the person to

15  try to use certain words.  But I don't recall in this instance

16  what we did.

17  Q.        But it's likely that you did do that?

18  A.        I don't recall.

19  Q.        If you do this under most circumstances, it is likely

20  that you did -- did so under this circumstance as well,

21  correct?

22  A.        I don't recall doing it, no.

23  Q.        Now, Mr. Blanford told you that the words that you

24  were asking -- or the words that were suggested to him were --

25  would be lies.  Did you at any point tell him that we want you

1   to lie?

2   A.      I don't recall saying that, no.

3   Q.      Did Agent Sommercamp tell him we want you to lie?

4   A.      I don't recall him saying that either.

5           THE COURT:  What did you tell him you wanted him to

6   do?

7           THE WITNESS:  We wanted him to place a recorded call

8   to Chris Tom to try to corroborate some information that we

9   had heard from John Ngo.

10          THE COURT:  Did you tell him what information you

11  wanted him to try to corroborate?

12          THE WITNESS:  About him paying -- him, Blanford paying

13  John Ngo, Aaron Silverman paying Tom -- paying John Ngo, and

14  Chris Tom paying John Ngo.

15  Q.      BY MS. REKHI:  You don't remember asking him specific

16  statements like you knew we paid him to turn to look the other

17  way, to turn a blind eye?

18  A.      I don't recall having a conversation with Mr. Blanford

19  about what he should say during the phone call.

20  Q.      So it's your testimony today that you did not tell him

21  to use those words?

22  A.      I don't recall saying that, to use those words, no.

23          MS. REKHI:  Just one moment, Your Honor.

24  Q.      You never had Mr. Blanford say, I kind of falsified

25  the documents and did fraudulent shit, to say that to Mr.

1    Chris Tom?

2    A.       I'm sorry.  What's your question again?  Can you

3    repeat it, please.

4    Q.       Did you have Mr. Blanford during this pretext call

5    say, I kind of falsified documents and did fraudulent shit?

6    A.       I don't recall saying that, no.

7    Q.       You never guided him to say that?

8    A.       No.  I don't believe so, no.  That is not the way I

9    talk.

10   Q.       Did Agent Fitzpatrick tell Mr. Blanford to use those

11   words?

12            THE COURT:  He's --

13            THE WITNESS:  I'm Agent Fitzpatrick.

14            MS. REKHI:  Oh, I'm sorry.  Agent Sommercamp to use

15   those words.

16            THE WITNESS:  I don't recall him saying that either.

17   Q.       BY MS. REKHI:  Did you or Agent Sommercamp tell Mr.

18   Blanford that he -- to say that he did not -- he did not know

19   how he was going to explain this in the pretext call to Chris

20   Tom?

21   A.       I don't understand your question.

22   Q.       Let me rephrase that.  Strike that actually.

23            Did you tell Mr. Blanford during the pretext call to

24   Chris Tom to say, They did ask about the money, you know, I

25   received from Bill and going through my bank account, and I

1  told them I was kind of being -- that Fong was being a mobile

2  notary for Bill and nothing more?

3       Did you coach these words from Mr. Blanford?

4  A.      No, I didn't.  He actually said those specific words

5  during the interview when we questioned Mr. Blanford about why

6  John Ngo was receiving money from Bill Bridge, and that's the

7  the response that Mr. Blanford gave to us.

8  Q.      I apologize, Agent Fitzpatrick.  I was looking at a

9  different pretext call.  I'm sorry.

10      The specific statement I wanted to question you about

11  was, did you tell Blanford to say, They have information,

12  John -- mostly from John that we -- that being Mr. Blanford

13  and Chris Tom -- were paying him cash during that time that

14  we're talking about contacting not only, you know, they --

15  Chris Tom -- and I'm reading this text.  You're probably going

16  to get a call but paying him for look the other way on certain

17  files.

18      And so what I'm trying to find out is, well, first of

19  all, they're probably going to be contacting you, and I want

20  to try to get a story straight here as far as paying Ngo.  And

21  so what do you think?

22      Did you coach him to say any of these words?

23  A.      Not that I recall, no.  A lot of those words are what

24  he had said during his interview to us.

25  Q.      Did you -- did Agent Sommercamp coach Mr. Blanford to

1    say any of these words?

2    A.        Not that I recall, no.

3    Q.        Did you or Agent Sommercamp tell Mr. Blanford to say

4    in quotes, Well, there was fraudulent loans that have gone

5    through, and obviously they have fraudulent documents that

6    they've traced back specifically to John and one of my

7    brokers?

8    A.        I don't recall saying that, no.

9    Q.        So it's your testimony today that you did not coach or

10   counsel Mr. Blanford in how to do the pretext call?

11   A.        I don't recall coaching Mr. Blanford, no.

12             MS. REKHI:   Nothing further with this witness, Your

13   Honor.

14             THE COURT:   All right.   You may cross-examine.

15                          CROSS-EXAMINATION

16   BY MS. RIMON:

17   Q.        Agent Fitzpatrick, when you met Blanford at the door,

18   did you insist on entering his home?

19   A.        No, we were invited in.

20   Q.        You testified that both you and Agent Sommercamp were

21   armed?

22   A.        That's correct.

23   Q.        Is that in accordance with typical procedure?

24   A.        Yes.

25   Q.        Can you explain what the rules are.

1    A.       Well, while on official duty we're required to carry

2    our firearm.

3    Q.       And was it displayed or obvious or how were you

4    wearing your weapons?

5    A.       We were I believe wearing suits that day like I am

6    today, which it's concealed, the firearm is concealed on my

7    right-hand side.

8    Q.       And did you make any attempt to show your weapon to

9    Mr. Blanford?

10   A.       No.

11   Q.       Did Mr. Blanford invite you into his house?

12   A.       Yes.

13   Q.       Did he choose the location where you would conduct the

14   interview?

15   A.       Yes.

16   Q.       And that was where again?

17   A.       It's like a dining room area.

18   Q.       Did you tell Mr. Blanford that he had to stay in any

19   particular area of the house?

20   A.       No, we did not.

21   Q.       Did you limit his movement in any way?

22   A.       No, we didn't.

23   Q.       How did he appear during the interview?  Did he appear

24   in any pain?

25   A.       No.

1        MS. REKHI:  Objection, calls for speculation, move to

2    strike.

3        THE COURT:  Overruled.

4    Q.    BY MS. RIMON:  Did he have any difficulty moving or

5    walking?

6    A.    No.

7    Q.    You testified that Mr. Blanford lied to you.  Can you

8    remind me of what those lies were.

9        MS. REKHI:  Objection, relevance.

10       THE COURT:  No, it's not irrelevant because I want to

11   know when he lied and when he told the truth.  And I want to

12   know which part of it the government thinks is the lie and

13   which part of it the government thinks is the truth.  I want

14   to know that.  Go ahead.

15       THE WITNESS:  The first lie is we asked Mr. Blanford

16   why was Bill Bridge paying John Ngo.  Mr. Blanford's response

17   was that John Ngo's wife was a traveling notary and had

18   performed some notary services on behalf of Bill Bridge, which

19   was untrue.

20   Q.    BY MS. RIMON:  You said notary services?

21   A.    Notary, yes.

22   Q.    And what was the other lie?

23   A.    The second lie was we asked Mr. Blanford when was the

24   last time he had spoken to John Ngo.  He had said

25   approximately a month ago while John Ngo was working for his

1   own funding.

2   Q.      And was that true?

3   A.      No.  He had spoken to John Ngo that morning.

4   Q.      And how did you know that?

5   A.      Because John Ngo placed a pretext call to John -- to

6   Mr. Blanford.

7   Q.      That morning?

8   A.      That morning.

9   Q.      I believe you testified that you presented Mr.

10  Blanford with the complaint against John Ngo; is that right?

11  A.      That's correct.

12  Q.      When you did that, how did he respond?

13  A.      He dipped his head down in his lap and said something

14  to the effect what do I gotta do to get out of trouble?

15  Q.      And what happened next?

16  A.      Umm, I can't believe -- I can't recall if it was me or

17  Agent Sommercamp told him he needs to start telling the truth.

18  And we started questioning him pertaining to the fraud.

19  Q.      And I believe you testified about the comment that he

20  made or question about whether he should get a lawyer.

21          Was that after you confronted him with the lies you

22  were aware of?

23  A.      Yes, it was after the lies, I believe.

24  Q.      And was it before or after the conversations you had

25  with him about the fraud that he was admitting to?

1    A.       I don't recall.  I -- I think if I had to guess --

2             THE COURT:  Don't guess.

3             THE WITNESS:  I don't recall.

4    Q.       BY MS. RIMON:  You mentioned that you confronted him

5    with the lies, and you showed him the complaint.  Describe

6    what happened after that.  Did someone arrive at the home?

7    A.       Yes.

8    Q.       Who arrived?

9    A.       I believe it was his wife and two small children.

10   Q.       And what happened when they arrived?

11   A.       He got up from the table and went to her and said

12   something to the effect of I'm in trouble, take the kids in

13   the other room.

14   Q.       And what happened?

15   A.       He came back to the table, and we asked him additional

16   questions.

17   Q.       Did the interview continue in the same place?

18   A.       Yes.

19   Q.       Do you recall whether the conversation about whether

20   he should get a lawyer happened before or after his wife came

21   home?

22   A.       I can't remember if it's -- that topic came up after

23   we confronted him with the lie or at the point in time when we

24   asked him to place the recorded call.  Those are the two

25   moments that it probably would have occurred.

1    Q.      You testified that you discussed or asked Mr. -- asked

2    Mr. Blanford if he'd be willing to make a recorded call,

3    correct?

4    A.      Yes.

5    Q.      Did you offer to drive Mr. Blanford in your government

6    car or Agent Sommercamp's car?

7    A.      Yes.

8    Q.      And what was his response?

9    A.      He elected to take his own vehicle.

10   Q.      And where were you driving to?

11   A.      We were driving to Benicia.  We didn't know

12   specifically what location, but to Benicia.

13   Q.      And how long was the drive from Mr. Blanford's home to

14   Benicia?

15   A.      Approximately 30 minutes.

16   Q.      And did he follow you the whole way?

17   A.      Yes.

18   Q.      And who decided where to stop?

19   A.      Umm, me or Agent Sommercamp.  I don't recall.

20   Q.      And did Mr. Blanford have a cell phone with him during

21   that 30-minute drive?

22   A.      Yes, he did.

23   Q.      And how do you know that?

24   A.      Because the pretext call that was placed was placed

25   from his telephone.

1    Q.       Do you know whether he called anyone during that

2    30-minute drive?

3    A.       I don't know.

4    Q.       But he could have?

5    A.       Yes.

6    Q.       You described that a recorded call took place after

7    that.  While you were in Agent Sommercamp's car, did Mr.

8    Blanford ever say he did not want to conduct that call?

9    A.       No.

10    Q.       Did he seem reluctant to make that call?

11    A.       No.

12            MS. RIMON:  Nothing further.  Thank you.

13            THE COURT:  Any redirect?

14            MS. REKHI:  Just one moment, Your Honor.

15                       REDIRECT EXAMINATION

16    BY MS. REKHI:

17    Q.       You're saying that you do not recall at what point Mr.

18    Blanford requested -- or asked -- questioned you about an

19    attorney?

20    A.       That's correct.

21    Q.       It might have been prior to the pretext call or prior

22    to -- or immediately after when he told you about not talking

23    to John Ngo.

24            THE COURT:  Wait.  Unless he's changing his testimony,

25    I thought it was while they were still at the house, which had

1    to be before the pretext call.

2         MS. REKHI:  Your Honor, I'm trying to get specifically

3    at what point in the conversation --

4         THE COURT:  Well, you said it might have been before

5    the pretext call.  I thought earlier it was at the house.

6         MS. REKHI:  I can clarify.

7         MR. CARDOZA:  Could we have one moment, Your Honor?

8         (Defense counsel conferring.)

9         MS. REKHI:  Nothing further.  Thank you.

10        THE COURT:  All right.  You may step down, Mr.

11   Fitzpatrick.  Thank you.

12        Do you have any other witnesses?

13        (Defense counsel conferring.)

14        MS. REKHI:  The defense would like to call Mr.

15   Blanford.

16        THE CLERK:  Please raise your right hand.

17                        JOEL BLANFORD,

18   a witness called by and on his own behalf, having been first

19   duly sworn by the Clerk to tell the truth, the whole truth,

20   and nothing but the truth, testified as follows:

21        THE WITNESS:  I do.

22        THE CLERK:  Thank you.  You may be seated.

23        THE COURT:  Before he testifies, counsel, what is your

24   understanding of the law as to whether any statements he makes

25   at this hearing may be used at trial in the event that he

1    testifies and makes any inconsistent statements?

2              MS. REKHI:  My understanding is that the

3    inconsistencies can be used against Mr. Blanford.

4              THE COURT:  And have you explained that to him?

5              MS. REKHI:  Yes.

6              THE COURT:  So he understands that if he testifies at

7    trial in any way differently than what he says at this

8    hearing, his testimony at this hearing may be used against him

9    at trial to impeach his testimony.

10             MS. REKHI:  I can speak with him briefly to --

11             THE COURT:  I think you need to have that

12   understanding.

13             (Defendant conferring with his counsel.)

14             THE COURT:  Ms. Rimon, is that also your understanding

15   of the law?

16             MS. RIMON:  Yes, Your Honor, it is.  Thank you.

17             THE COURT:  Have you had a chance to talk to Mr.

18   Blanford now --

19             MS. REKHI:  Yes, Your Honor.

20             THE COURT:  -- and explain that to him?

21             MS. REKHI:  Yes, I have.

22             THE COURT:  All right.  You may proceed.

23             THE CLERK:  Please state your full name, spell your

24   last name for the record.

25             THE WITNESS:  Joel Andrew Blanford, B-L-A-N-F-O-R-D.

1                        DIRECT EXAMINATION

2    BY MS. REKHI:

3    Q.      Good morning, Mr. Blanford.

4    A.      Good morning.

5    Q.      Do you recall what happened on December 4th, 2007?

6    A.      Yes, I do.

7    Q.      Were you at home that morning?

8    A.      Yes, I was.  Umm, the previous day I had put up

9    Christmas lights, my back was killing me.  I'm an outside

10   sales rep, so I was working from my home office.

11   Q.      Now at some point in the morning, did two individuals

12   arrive at your residence?

13   A.      I would say sometime around 10:00 o'clock there was a

14   knock at the door.  I've got glass pane windows.  When I went

15   to the door, I saw the pant legs and shoes.  I thought they

16   were Jehovah's witness, so I was just going to answer the door

17   and shoe them on their way.

18           When I opened the door, two men in suits -- I think

19   one had a black suit, and the other was wearing like a

20   Member's Only jacket -- asked if I was Joel Blanford.  I said

21   yes.  Immediately there was a badge shown in my face and said

22   we need to ask you some questions.

23   Q.      Did they at this point -- I'm sorry.  Let me start

24   with who identified themself -- who identified who?

25   A.      I believe it was Agent Sommercamp.

1   Q.      And he introduced himself and Agent Fitzpatrick?

2   A.      He identified himself as FBI and flashed his badge.   I

3   believe he did identify Agent Fitzpatrick.

4   Q.      Now, at this point, did either of the agents tell you

5   that you did not have to speak with them?

6   A.      No.

7   Q.      Did you invite them into your residence?

8   A.      No.

9   Q.      Did they just walk -- did you -- the door was open,

10  and they just walked into the house?

11  A.      I was standing with the door open when Agent

12  Sommercamp showed his badge and told me he had to ask me some

13  questions.  They then entered my residence.

14  Q.      And at this point, did you want to talk to them?

15  A.      No.

16  Q.      Why did you not tell them that you did not want to

17  talk to them?

18  A.      I was intimidated.  I noticed that Agent Sommercamp

19  had a firearm, and I was home alone.

20  Q.      Okay.  And at this point --

21          THE COURT:  Well, is it because you thought you had to

22  talk to police officers or because you thought they'd shoot

23  you if you didn't?  I mean, what effect did the gun have?

24          THE WITNESS:  Well --

25          THE COURT:  You know, I read that in the cases, and I

1    really wonder about it, if judges on the appellate courts

2    really think that people who are interrogated by agents are

3    afraid they're going to be shot in this country.

4              What effect did the gun have on your decision --

5              THE WITNESS:  I was intimidated that I had two

6    officers standing in my entryway armed.  It did not make me

7    feel comfortable at all.

8    Q.       BY MS. REKHI:  Now, at some point they proceed into

9    the formal dining room area, correct?

10   A.       Correct.

11   Q.       What happens next?

12   A.       Well, they had asked me -- they told me, We need to

13   ask you some questions.  I said, Right now?  Yes, we do.

14             We walked to the nearest table, which is my formal

15   dining room, which is probably ten feet away from the front

16   door or maybe fifteen.

17   Q.       And then they sat down?

18   A.       Yes.

19   Q.       And you were sitting on one side of the table, the

20   other agents were seated where?

21   A.       I sat on one side of the table, directly across from

22   me was Agent Fitzpatrick, diagonal to my right was Agent

23   Sommercamp.

24   Q.       Did they begin to ask you questions?

25   A.       Umm, the main interrogator was Agent Fitzpatrick.  He

1   started asking me questions about, umm, Long Beach Mortgage,

2   Washington Mutual, really basic questions about what I did

3   there, what was my history, umm, what I did in my job duties.

4   Umm, that's where it started.

5   Q.      And at some point did the conversation turn to John

6   Ngo?

7   A.      At some point they started asking more specific

8   questions regarding to the people that I worked with, John

9   Ngo, yes.

10  Q.      And they asked you whether you had talked to John Ngo,

11  correct?

12  A.      Yes.

13  Q.      And did the demeanor of the officers change after this

14  question?

15  A.      There was a point during the interrogation where Agent

16  Sommercamp had gotten up and walked over by my office, which

17  is by the front door.  He was on his cell phone.  I don't know

18  what he was doing, but he was glaring at me, staring at me

19  while Agent Fitzpatrick continued to ask me questions about

20  John Ngo and what John did.

21          Umm, there was a certain point later where Agent

22  Sommercamp returned to the table after the phone call, and

23  then I was asked when the last time I spoke to John Ngo.

24  Q.      And when you told them you hadn't spoken with him

25  recently, they accused you of lying, correct?

1    A.        Yes.

2    Q.        And did their demeanor change at this point?

3    A.        Absolutely.

4    Q.        How did it change?

5    A.        They became hostile is how I would refer to it.

6    Q.        Do you recall at what point you asked if you could

7    talk to an attorney, if you did at all?

8    A.        Yes.  After they started to ask me some specific

9    questions -- and specifically I remember Agent Fitzpatrick

10   stating, umm, if you don't cooperate with the government,

11   you're going down for everything.  I then told him, Can I

12   contact an attorney?  Agent Fitzpatrick told me, no, it will

13   slow the process down.

14   Q.        And did you believe him?

15   A.        Yes.

16   Q.        What happened after that?

17   A.        They continued to ask me questions regarding, umm, not

18   only John Ngo, but my relationship to Bill Bridge and The Loan

19   Center.

20   Q.        And how did you -- what was their demeanor like during

21   this?

22   A.        Hostile.

23   Q.        At this point, did they tell you that you did not have

24   to talk to them?

25   A.        Absolutely not.

1   Q.      Did they give you -- did they tell you that whatever

2   statements you were making would be voluntary?

3   A.      Absolutely not.

4   Q.      Did you tell -- did they tell you that you have the

5   constitutional right to an attorney?

6   A.      Absolutely not.

7   Q.      Now, what happens after this?

8   A.      Well, they continued to ask me questions about

9   payments between The Loan Center and John Ngo and also between

10  myself and John Ngo, which I told them, to the best of my

11  knowledge, what I knew.

12  Q.      And did they tell you -- did they say anything to you

13  to make you believe that they -- that they did not believe

14  what you were saying?

15  A.      Absolutely.

16  Q.      What did they say?

17  A.      Umm, specifically they were saying things like that's

18  not good enough, you're lying.  And Agent Sommercamp on more

19  than one occasion said, You're going to jail.

20  Q.      Did you believe him?

21  A.      Yes.

22  Q.      Were you -- at this point, or even prior to this

23  point, did you feel free to leave?

24  A.      Absolutely not.

25  Q.      Did you feel free to end the interrogation?

1   A.        No.

2   Q.        Now, what happened next?

3   A.        Well, they continued to ask me the same questions and

4   rewording them mostly by Agent Fitzpatrick relating to

5   fraudulent documents that John Ngo had produced for Bill

6   Bridge.  Now, during the interrogation, they had slid a piece

7   of paper over to me and said, we know you know, we've got

8   proof here, and I didn't know.  Umm, I continued to say I

9   didn't know.  They were telling me, That's not good enough.

10  Q.        Now, at some point did they tell you that you had to

11  make a pretext call?

12  A.        At the end of the interrogation, umm, the agents got

13  up, told me I had to make a call and that I had to go with

14  them.

15  Q.        And what did you do at this point?

16  A.        I asked them, Do I have to go now?

17  Q.        And what --

18  A.        They said yes.

19  Q.        And what did you do then?

20  A.        Well, my back was hurting.  I was still in my sweats,

21  I mean, that was basically what I wore to bed, so I asked them

22  if I could change my clothes.  Agent Sommercamp then asked me

23  if I had any firearms or weapons in the house.

24  Q.        Now, prior to them telling you about the pretext call,

25  did they tell you that this would be a voluntary pretext call?

1   A.       Absolutely not.

2   Q.       Did you want to make this pretext call?

3   A.       No.

4   Q.       Now, at some point you are -- you go to Benicia,

5   correct?

6   A.       Yes.

7   Q.       The agents tell you what to do, how to get to Benicia;

8   is that correct?

9   A.       They told me I had to follow them.

10  Q.       And when you arrive in Benicia, what happens there?

11  A.       I don't know Benicia, never been to Benicia, may have

12  driven through it, but I've never pulled off.  They pulled off

13  on I guess the first exit in Benicia.  There was an elementary

14  school and like a carpool parking lot.  They pulled in.  It

15  was almost full, there was only a couple of spots.  They

16  pulled in, and I pulled in next to them and parked.

17  Q.       And what happened then?

18  A.       The agent told me to get out of my car.

19  Q.       And what did you do?

20  A.       I got out of the car.

21  Q.       Did you get into the agent's vehicle?

22  A.       Umm, I was motioned -- they got out of their car.  I

23  was motioned to sit in the front passenger seat of their

24  vehicle.

25  Q.       And what happened then?

1    A.      Well, I sat down, and they started to explain what I

2    needed to do.  Basically the explanation was you need to

3    contact Chris and Aaron and talk about the payments that they

4    made to John Ngo.

5    Q.      And what did you do?

6    A.      Well, I wasn't sure what to do.  Umm, I had never -- I

7    had never been involved in something like this.  Umm, one of

8    the agents had a yellow notepad, said I'll help you and

9    started writing notes on the yellow notepad.  He said, We need

10   you to say these things.  The first thing he said was

11   fraudulent documents, and he wrote it in there clearly, you

12   need to talk about fraudulent documents.

13          I think they could tell I was very nervous and very

14   uncomfortable, so they were trying to coach me through this.

15          The second thing they wrote was pay John for looking

16   the other way.  So they were trying to give me, like, I guess

17   catch phrases or something in order to say to Chris and Aaron.

18   Q.      And did you at any point tell them that what they

19   were -- what these words were were not true?

20   A.      Yes.

21   Q.      And what -- what was their response?

22   A.      I told them that would be lying.  They looked at each

23   other and said, We want you to lie.

24   Q.      What happened then?

25   A.      They got a recording device of some sort, plugged it

1    into my phone.  There was an earpiece that they put in my ear,

2    an earpiece that one of the agents had, and they asked me to

3    make the call.

4    Q.      Did they at this point tell you that this would be a

5    voluntary pretext call, that you did not have to make this

6    pretext call?

7    A.      No.

8    Q.      Now, after the pretext call is done, what happens

9    next?

10   A.      After the call -- well, I called Chris Tom, who did

11   answer, and we talked briefly, maybe a couple of minutes.

12   Then they told me I need to do the same thing to Aaron that I

13   just did to Chris.

14   Q.      Now, after that's done, what happened?

15   A.      Aaron didn't answer, I left a message.  At that time,

16   they disconnected the equipment from my cell phone.  Umm, one

17   of the agents put a paper in front of me and said I needed to

18   sign it, and I signed it.

19   Q.      Did you read this piece of paper?

20   A.      No.

21   Q.      What did you do next?

22   A.      I wasn't sure what to do, I was waiting for

23   instruction.  I wasn't sure if they were going to take me to

24   jail.

25   Q.      What did you do then?

1   A.      Agent Fitzpatrick then started instructing me on what

2   I needed to do.  He handed me his business card and told me

3   that I needed to contact him daily and try to set up meetings

4   with both Aaron and Chris, and that I needed to call him so he

5   could wire me.

6   Q.      And --

7   A.      He also told me that I was not to speak to anyone

8   except for my wife.

9   Q.      What did you do after this?

10  A.      Well, I got out of the car and got back into my car

11  and just sat in my car for, I don't know, 15 or 20 minutes.

12  The agents left immediately.

13          MS. REKHI:  Okay.  Nothing further, Your Honor.

14          THE COURT:  You may cross-examine.

15                         CROSS-EXAMINATION

16  BY MS. RIMON:

17  Q.      Good morning, Mr. Blanford.

18  A.      Good morning.

19  Q.      While the agents were at your house, they never

20  unholstered their weapons, did they?

21  A.      No.

22  Q.      They never made reference to their weapons, did they?

23  A.      No.

24  Q.      Their weapons were under their jackets the entire

25  time, weren't they?

1   A.      Yes.

2   Q.      You led the agents to a table in your house when they

3   came in; isn't that correct?

4   A.      We did it together.

5   Q.      You decided where to sit; isn't that right?

6   A.      There was nowhere else to sit by the entryway.  There

7   was a couch which -- it was the only table.

8   Q.      They had never been to your home before; is that

9   right?

10  A.      No.

11  Q.      The agents never told you that you couldn't leave the

12  table, did they?

13  A.      No.

14  Q.      They never told you you couldn't make a phone call,

15  did they?

16  A.      No.

17  Q.      They never told you you couldn't leave your house?

18  A.      They didn't tell me that.

19  Q.      They didn't tell you you couldn't go to another room?

20  A.      They didn't tell me that.

21  Q.      There were only two agents present the entire time; is

22  that right?

23  A.      Yes.

24  Q.      Before this interview happened, you were aware that

25  the FBI was looking at activities at Long Beach Mortgage,

1    weren't you?

2    A.       Yes.

3    Q.       You were aware that they were looking at John Ngo;

4    isn't that right?

5    A.       Yes.

6    Q.       And you were aware that they were looking at you;

7    isn't that correct?

8    A.       No.

9    Q.       Isn't it true that you yourself had previously talked

10   to Special Agent Kathleen Nicolls of the FBI?

11   A.       She had -- there had been a conversation where she

12   asked me to meet her at an unspecified location, it was like

13   the mall.

14   Q.       But she wanted to talk to you about your activities at

15   Long Beach Mortgage; isn't that right?

16   A.       She said she had some questions, sure.

17   Q.       So it wasn't a surprise to you that agents were

18   interested in talking to you about Long Beach Mortgage --

19   A.       It was a surprise because Agent Nicolls had called me

20   and said we no longer need to talk to you, and these agents

21   showed up unannounced.

22   Q.       But you knew that they were investigating?

23            MS. REKHI:  Objection, calls for speculation.

24            THE COURT:  Overruled.

25            THE WITNESS:  Yes.

48

1          THE COURT:  You may answer the question.

2          THE WITNESS:  Yes.

3   Q.     BY MS. RIMON:  Now you testified that before you left

4   the house to make the call, you changed your clothes, correct?

5   A.     Yes.

6   Q.     You went upstairs in your house to do that, didn't

7   you?

8   A.     Yes.

9   Q.     Your wife was in the house at the time, wasn't she?

10  A.     Yes, she was.

11  Q.     So you had the opportunity to talk to her before you

12  left, correct?

13  A.     Briefly.

14  Q.     And then you drove for about 30 miles from your home

15  to the location in Benicia; is that right?

16  A.     Yes.

17  Q.     You had your cell phone with you the entire time?

18  A.     Yes.

19  Q.     Now you testified that you signed a paper after the

20  call was made?

21  A.     Yes.

22          MS. RIMON:  I'd like to show you what's been marked as

23  Government's Exhibit 100.  If I may approach, Your Honor.

24          THE COURT:  Yes.

25  Q.     BY MS. RIMON:  Mr. Blanford, do you recognize that

```
 1    document?
 2    A.      Not specifically.  I don't remember exactly what the
 3    document looked like, but --
 4    Q.      Do you see your signature on that document?
 5    A.      Yes, I do.
 6    Q.      Is this the consent form that you signed after the
 7    phone call was made?
 8    A.      It would appear that way.
 9            MS. RIMON:  Your Honor, I move to admit Government's
10    Exhibit 100.
11            THE COURT:  Any objection?
12            MS. REKHI:  Your Honor, I would just state for the
13    record that I don't know when they received this document
14    because this is the first time I've seen this.  That's it.
15            THE COURT:  Have you shown it to --
16            MS. REKHI:  I just -- yes, Ms. Rimon did provide it to
17    me right now.
18            THE COURT:  All right.  Let me see it.
19            MS. RIMON:  Your Honor, we received the document on
20    Monday, I believe.
21            THE COURT:  You received it Monday?
22            MS. RIMON:  Yes.
23            THE COURT:  From whom?
24            MS. RIMON:  Well, I myself.  The FBI had the document.
25            THE COURT:  I wonder what else they haven't given you.
```

1          MS. RIMON:  I'm sorry, Your Honor?

2          THE COURT:  I'm saying I wonder what else they haven't

3     given you.  I would assume if it was an FBI document you would

4     have had it before Monday, particularly when it relates to the

5     interviews that you always intended to offer in evidence.

6          MS. RIMON:  Your Honor, issues as to the suppression

7     of this matter came up very late.  So we've had it available,

8     but we haven't had the actual document.

9          THE COURT:  So what's the testimony, this was signed

10    before or after he made the call?  What's the testimony?

11         MS. RIMON:  The testimony is that it was signed after

12    the call.

13         THE COURT:  So what's the sense in consenting to

14    something after it happens?

15         MS. RIMON:  It's an indication of what had occurred, I

16    believe, Your Honor.  The Court can decide what weight to give

17    it as can the trier of fact at trial.

18         THE COURT:  So even the government takes the position

19    that they gave him a form authorizing them to install a

20    recording device on his telephone after they had already done

21    so.

22         MS. RIMON:  Your Honor, I submit this exhibit for the

23    record to be complete as to what the facts are.  I think --

24         THE COURT:  All right.

25         MS. RIMON:  -- there are other reasons that support

1   the voluntariness of the call, but I didn't want to leave it

2   out.

3        THE COURT:  I'm not -- I don't think the voluntariness

4   of the call is an issue.  I haven't heard anything about

5   voluntariness.  I've heard of Miranda.

6        Miranda is different than voluntary.  And custody is

7   different than interrogation.  All these terms are terms of

8   art, and you're all just tossing them around in here like they

9   don't mean anything.

10       Exhibit 100 is received in evidence.

11                      (GOVERNMENT'S EXHIBIT 100, consent

12                      form signed by defendant, ADMITTED

13                      INTO EVIDENCE.)

14  Q.     BY MS. RIMON:  Mr. Blanford, the date of the interview

15  that we're discussing is December 4th, 2007; is that correct?

16  A.     Yes.

17  Q.     And that's the same date that you drove to Benicia

18  with the agents; is that right?

19  A.     Yes.

20  Q.     And that's the same date that you called the former

21  assistant U.S. Attorney on this case, Mr. Courtney Linn; isn't

22  that correct?

23       MS. REKHI:  Objection, exceeds the scope of direct.

24       THE COURT:  Sustained.  It's outside the scope of the

25  hearing as far as I know.

1           MS. RIMON:  Your Honor, it goes to Mr. Blanford's

2     state of mind during the interview, and I believe there were

3     facts that occurred after that and whether or not his

4     statements today are truthful given the length of time that's

5     passed since the matter was in front of him.

6           THE COURT:  All right.  Since there's no jury present

7     and it's not going to consume unnecessary time, I'll hear what

8     the question is and what the answer is.

9           MS. REKHI:  Your Honor, I'm still objecting to that.

10    I believe that if the issue is the defendant's state of mind,

11    one, the U.S. Attorney could have had Mr. Courtney Linn

12    present to testify to whatever his interaction may have been.

13          THE COURT:  Well, they can ask -- if it's relevant,

14    they can ask Mr. Blanford as easily as they can ask Mr. Linn,

15    who doesn't work for the government any more.

16          Go ahead.

17    Q.    BY MS. RIMON:  To repeat the question, Mr. Blanford --

18    A.    Please.

19    Q.    -- you spoke with the former assistant U.S. Attorney

20    Mr. Linn on this case that same day, didn't you?

21    A.    I don't know what day I spoke to him, but yes.

22    Q.    And you asked him what benefit you could get by

23    cooperating; isn't that correct?

24          MS. REKHI:  Objection --

25          THE WITNESS:  No.

1          MS. REKHI:  -- relevance.

2     Q.      BY MS. RIMON:  You wanted to talk to him --

3          THE COURT:  He said no.

4     Q.      BY MS. RIMON:  You wanted to talk to him about whether

5     you should cooperate; is that right?

6     A.      The reason for calling Mr. Linn was to ask if I could

7     get an attorney.  I did not feel right following the orders of

8     Agent Fitzpatrick.

9     Q.      And you actually hired Mr. Cardoza's law firm a couple

10    of days later or maybe even less; is that right?

11         MS. REKHI:  Objection, relevance.

12         THE COURT:  It's actually helping him, Ms. Rekhi,

13    because the testimony is that he called the U.S. Attorney to

14    ask him if he should get a lawyer.

15         MS. REKHI:  I understand.

16         THE COURT:  The objection is overruled.

17         THE WITNESS:  Can you repeat the question, please.

18    Q.      BY MS. RIMON:  Did you hire a lawyer a couple days

19    later?

20    A.      Yes.

21    Q.      And you've been represented by counsel this entire

22    time since then?

23    A.      Yes.

24    Q.      And you received a copy of Agent Fitzpatrick's report

25    summarizing this interview over two years ago; is that right?

1        MS. REKHI:  Objection, relevance.

2        THE COURT:  Sustained.

3        MS. RIMON:  Your Honor, Mr. Blanford is testifying

4   about events that occurred two and a half years ago.  This

5   issue has been before him and his counsel for that time.  He's

6   been aware of his statements, and there's a question as to his

7   credibility.

8        THE COURT:  Well, there's a question as to whether the

9   motion is timely, which you have already raised.  But that's

10  his lawyer's decision as to whether to bring the motion before

11  trial or not, it's not his decision.

12       Overruled.  I mean -- I'm sorry -- the objection is

13  sustained.

14       MS. RIMON:  All right.  Thank you, Your Honor.

15  Nothing further.

16       THE COURT:  Any redirect?

17       MS. REKHI:  No further questions, Your Honor.

18       THE COURT:  All right.  Thank you, Mr. Blanford.  You

19  may step down.

20       MS. REKHI:  And no further witnesses, Your Honor.

21       MS. RIMON:  Your Honor, we'd like to call Agent

22  Sommercamp.

23       THE COURT:  All right.  You may proceed.

24       THE CLERK:  Sir, please step forward and stand here in

25  front of the Court Reporter and face me.

1                              JOHN SOMMERCAMP,

2     a witness called by the Government, having been first duly

3     sworn by the Clerk to tell the truth, the whole truth, and

4     nothing but the truth, testified as follows:

5                THE WITNESS:  I will.

6                THE CLERK:  Thank you.  You may be seated.

7                Please state your full name, spell your last name for

8     the record.

9                THE WITNESS:  John Sommercamp, J-O-H-N,

10    S-O-M-M-E-R-C-A-M-P.

11                           DIRECT EXAMINATION

12    BY MS. RIMON:

13    Q.     Agent Sommercamp, what is your current occupation?

14    A.     I'm a special agent with the FBI here in Sacramento.

15    Q.     And how long have you been an agent with the FBI?

16    A.     12 years.

17    Q.     And what is your current assignment?

18    A.     Assigned to a white collar squad, and I work primarily

19    mortgage fraud.

20    Q.     Did there come a time where you worked on an

21    investigation of Joel Blanford?

22    A.     Yes.  I assisted with the case starting in

23    approximately the summer of 2007.

24    Q.     And what was your role in assisting generally?

25    A.     I assisted with some -- some interviews and some

1    recordings that were done, as well as I believe a search

2    warrant and some arrests as well.

3    Q.      Did you have an opportunity to interview Mr. Blanford

4    during the investigation?

5    A.      I did.

6    Q.      And approximately when was that?

7    A.      On or about December 4th, 2007.

8    Q.      And what led to that interview occurring?

9    A.      Previously on November 30th of 2007 we had arrested

10   John Ngo, who worked with Mr. Blanford.  Following that

11   weekend, I believe it was then December 3rd of 2007, Mr. Ngo

12   conducted consensual recordings from our office between him

13   and Mr. Blanford.  So the next day we had planned on December

14   4th to do recordings again and then attempt to interview Mr.

15   Blanford.

16   Q.      And where did the interview of Mr. Blanford occur?

17   A.      At his house in San Ramon.

18   Q.      And who was present during the interview?

19   A.      Myself and my partner, Agent Chris Fitzpatrick, with

20   the IRS criminal division as well as Mr. Blanford.  And then

21   for a while his wife was not present for the interview but

22   came home with some kids.

23   Q.      And who drove to the interview?

24   A.      I drove my vehicle.

25   Q.      And where did you park?

1    A.       Parked on the street about one house down.

2    Q.       And did you have a marked or unmarked car?

3    A.       All our cars are unmarked.

4    Q.       And describe what happened after you parked the car.

5    A.       Chris and I walked up to the door.  I don't know if I

6    knocked or rang the door bell.  Mr. Blanford answered.  I

7    showed him my identification, told him my name, I was with the

8    FBI out of Sacramento, introduced my partner and told him we

9    were working on a mortgage fraud case, asked him if we could

10   come in and talk to him, we had questions for him about the

11   case.

12   Q.       And what was his response?

13   A.       He allowed us to come in and talk to him inside his

14   home.

15   Q.       And once you were inside, what happened?

16   A.       We sat down at what looked like an informal type of

17   dining room table in what I remember is like a great room.

18   The table was off in the corner of the home kind of adjacent

19   to -- I think the kitchen might have been behind it.

20   Q.       And who decided where you would sit to talk?

21   A.       Mr. Blanford decided where we would sit.

22   Q.       And at that time, was there anyone else in the house

23   as far as you knew?

24   A.       Not that we knew.

25   Q.       Who conducted the interview?

1   A.      Chris was the lead person asking the questions, and I

2   began taking notes for the first half of the interview.

3   Q.      Describe how the conversation started, if you will.

4   A.      Background questions as we always do asking Mr.

5   Blanford how long he'd been employed, what his position was,

6   his responsibilities, duties, how the loan process works.

7   General background questions.

8   Q.      And did you ask him any specific questions?

9   A.      We got into specific questions, yes.

10  Q.      And what were those?

11  A.      Umm, the first two specific questions -- the first one

12  I recall was we asked him why -- if he knew, why Bill Bridge

13  was making payments to John Ngo.

14  Q.      And what was his response?

15  A.      He indicated that he believed the payments were being

16  made because John Ngo's wife, I believe her name is Fong, was

17  a traveling notary and that he may have been paying for her

18  services.

19  Q.      Were there any other specific questions?

20  A.      We asked him when the last time he spoke to John Ngo

21  was.

22  Q.      And what was his response?

23  A.      He said a month ago.

24  Q.      And what happened after that?

25  A.      Agent Fitzpatrick asked -- well, informed Mr. Blanford

1    that it was -- it could be considered a crime to lie to

2    federal agents and to be clear to tell the truth to us when we

3    ask questions of him.

4    Q.      And did you show him anything?

5    A.      At that point Chris presented him with a copy of the

6    criminal complaint filed against John Ngo as well as the

7    arrest warrant of John Ngo.

8    Q.      And what was his response?

9    A.      His response, as I recall, was he put his head down,

10   he bowed his head down for a moment, and then he came back up

11   and said something to the effect of what do I need to do to

12   help or assist you or assist myself, something to that effect.

13   Q.      And then what happened?

14   A.      We told Mr. Blanford that we had conducted a

15   consensual recording between John Ngo and himself earlier that

16   morning and that we knew he had lied to us in statements

17   previous, in the two previous statements that he answered.

18   Q.      And do you recall his response?

19   A.      I guess that was at the moment that he put his head

20   down, so I had that a little bit reversed.

21   Q.      And during this interview, did you tell Mr. Blanford

22   he had to stay in any particular place?

23   A.      Not at all.

24   Q.      Or limit his movements in any way?

25   A.      Absolutely not.

1  Q.      And how did Mr. Blanford appear during the interview?

2  Did he appear to be in pain?

3  A.      No, he didn't appear to be in pain.

4  Q.      Did he have any difficulty moving or walking?

5  A.      No, I didn't notice any difficulty moving or walking

6  from the time he answered the door, back to his seat or when

7  his wife came in and he went to talk to her.

8  Q.      And describe what happened when his wife came.

9  A.      He said something to her of the effect of, honey, I'm

10  in real trouble or I'm in trouble.  And then he walked over to

11  her and spoke to her.  And we didn't get up or engage his wife

12  in a conversation, so I don't know what took place at that

13  point.  And then she left the room with the kids.  She didn't

14  stay, she wasn't present for the interview.

15  Q.      And did the interview continue after this?

16  A.      Continued.  That was probably about the halfway point.

17  Q.      And what subjects were discussed after -- after that

18  point?

19  A.      Well, we went back over the -- we went back over

20  the -- well, we went back over the two topics that we had just

21  discussed, that you've lied to us about how long it had been

22  since you had spoken to Mr. Ngo and that this story about

23  paying, you know, as a notary was untrue as well.

24          And then he told us -- he started to give us more

25  details about Blanford and -- or about John Ngo and what he

1    did and how people were paid and commissions and so forth,

2    kind of detailing the business.

3    Q.      And did you ask Mr. Blanford to make a recorded call

4    at some point?

5    A.      By the end of the -- I believe it was at the end of

6    our interview we asked him if he would be willing to make a

7    consensual call, yes.

8    Q.      And what was his response?

9    A.      He said he would.

10   Q.      And then what happened?

11   A.      Well, at some point we all walked, the three of us

12   walked outside.  I remember asking him if he wanted to drive

13   with us, and he didn't.  He chose to take his own car.

14   Q.      Why did you need to go somewhere else?

15   A.      Because, umm, my agency has a policy that if we're

16   going to do recordings, first of all, we have to get approval

17   from our own office to do those recordings.  So I had approval

18   to do those recordings in my district.  I didn't have approval

19   at the time, we couldn't track down the manager that we needed

20   to get approval from in the Northern District.  So instead of

21   wait, we just simply drove back to my district, which was --

22   the nearest point was in Benicia and conducted the call at

23   that location.

24   Q.      And did he drive with you or in his own car?

25   A.      No.  I believe he had a Jaguar, and he drove in his

1    own vehicle to the location.

2    Q.      And did he follow you?

3    A.      That was what I recall, yes.

4    Q.      And who decided where to stop?

5    A.      Chris and I basically picked one of the first exits as

6    you cross the bridge into Benicia.  And I believe it was a

7    little -- there was a little park and ride or a little lot off

8    to the east side of the freeway is where we stopped.

9    Q.      And what happened after you stopped?

10   A.      Oh, we stopped our vehicles.  Umm, at some point we

11   had Mr. Blanford come in my car.  He sat in the front seat,

12   and Chris left the front seat and sat in the back seat of my

13   car.

14   Q.      And then what happened?

15   A.      And then we had him conduct a call to Chris Tom, a

16   consensual recording to Chris Tom.

17   Q.      Can you describe the equipment that you used.

18   A.      We have a -- just a digital recorder, it's probably

19   maybe four inches long by an inch wide, and it has an earpiece

20   attachment.  So you put the earpiece in your ear that the

21   phone is going to be up against, and then the -- it will

22   capture your audio as well through the microphone.  And then I

23   took care of the actual holding of the recording device

24   knowing how it worked to start it and stop it.

25   Q.      And did you discuss with Mr. Blanford what he would

1   say on the call?

2   A.      There were -- Chris handled most of that, as I recall,

3   since he was more familiar with the case.  But we gave him

4   some general outlines of topics to discuss with Mr. Tom, maybe

5   some questions to ask as well.

6   Q.      And about how long did the call last?

7   A.      I don't think it lasted but a couple minutes.  It

8   wasn't -- it wasn't very successful.  Mr. Tom was very short

9   with his answers of just yes or no type answers.  I don't

10  remember much, umm -- I don't remember it generating really

11  much of a response.

12  Q.      And what happened after the call?

13  A.      Well, we would have turned off the device, and at some

14  point we would have parted ways.  I also had -- and I'm not

15  sure of my recollection for -- I know that the normal process

16  would have been to do this ahead of time.  But either before,

17  during or after -- well, not during.  Before or after the

18  call, I had Mr. Blanford sign an FD-472 form, which is our

19  internal form giving consent from the consenting party to

20  conduct a recording.

21  Q.      Is there an exhibit at your --

22  A.      There's nothing up here, but, I mean, I've seen

23  something before.

24          MR. CARDOZA:  Laurel.

25          MS. RIMON:  May I approach the witness, Your Honor?

```
 1              THE COURT:  Yes.

 2    Q.      BY MS. RIMON:  Please take a look at what's been

 3    admitted as Government Exhibit 100.  Do you recognize that?

 4    A.      I do.

 5    Q.      And what is that?

 6    A.      This is the FD-472 form which gives permission to the

 7    special agents along with the consenting party to conduct a

 8    recording, a telephonic recording.

 9    Q.      And does this form contain your signature?

10    A.      My signature's at the bottom with Mr. Fitzpatrick

11    underneath me, and Mr. Blanford above and to the right of my

12    signature.

13              MS. RIMON:  Okay.  Thank you.  No further questions.

14              THE COURT:  You may cross-examine.

15                          CROSS-EXAMINATION

16    BY MS. REKHI:

17    Q.      Good morning, Agent Sommercamp.

18    A.      Good morning.

19    Q.      How are you?

20    A.      Good, thank you.

21    Q.      Have you -- have you discussed your testimony today

22    with Agent Fitzpatrick prior to coming to court today?

23    A.      Yes, we have.

24    Q.      So you guys talked about what you were going to

25    testify to?
```

1    A.      We just went over, umm, the 302.  Actually mostly we

2    did it yesterday as opposed to today, reviewing the 302,

3    trying to refresh my memory.

4    Q.      And you didn't prepare a 302 in this matter, correct?

5    A.      No.  He prepared an MOI, which is his version of my

6    302.

7    Q.      Okay.  So you had an opportunity to look over this

8    report that was prepared shortly after December 4th, 2007,

9    correct?

10   A.      Yes.

11   Q.      And in that report, do you recall seeing anything

12   about the defendant hanging his head down and saying what

13   could I do to help myself or help you?

14   A.      No.

15   Q.      So that's never -- that was never put in the report,

16   correct?

17   A.      No.

18   Q.      Okay.  Now, prior to going to the defendant's house,

19   to the residence, you had already tried to do two pretext

20   calls or you had done two pretext calls with John Ngo to Mr.

21   Blanford.

22   A.      Yes.

23   Q.      So one of the primary purposes of you going to the

24   residence was to try to get more statements out of Mr.

25   Blanford, correct?

```
 1    A.      Yes.

 2    Q.      And to -- and by this time you suspected that there

 3    might be some involvement and to get more information from him

 4    regarding his involvement?

 5    A.      Yes.

 6    Q.      And when you arrived there, during the conversation

 7    you showed him the indictment against John Ngo.

 8    A.      Showed him the complaint.

 9    Q.      The complaint, sorry.  The complaint against John Ngo.

10    A.      Yes.

11    Q.      And, again, to get him to talk to you more?

12    A.      Yes.

13    Q.      And did -- at this point, did the defendant ask if he

14    could speak to an attorney?

15    A.      He at some point mentioned -- umm, my recollection was

16    he never invoked his right to counsel.  He mentioned something

17    to the effect of, you know, do I need an attorney?  And I

18    don't provide legal advice to people, umm, so that is not

19    something that I necessarily addressed with him.

20    Q.      Did you --

21            THE COURT:  Did Mr. Fitzpatrick address it with him?

22            THE WITNESS:  Yes, it was Mr. Fitzpatrick who was

23    speaking with him at the time is my recollection.

24            THE COURT:  What did Mr. Fitzpatrick say when he asked

25    whether he needed an attorney?
```

```
 1            THE WITNESS:  To the best of my recollection, umm --
 2   well, I don't really recall to be honest the specific
 3   conversation that Chris had with him regarding his -- his
 4   question to an attorney other than the fact that he did not
 5   invoke his right to have an attorney present or --
 6            THE COURT:  You recall the question being asked,
 7   though, whether he needed an attorney.
 8            THE WITNESS:  Yes, I do recall that.
 9            THE COURT:  What do you recall about the answer if
10   anything?
11            THE WITNESS:  I -- I just seem to recall that Chris
12   said something to the effect that, umm, you have -- you can
13   get an attorney.  Umm, I remember him saying that, you can get
14   an attorney if you like, something to that effect.
15            THE COURT:  Anything else?
16            THE WITNESS:  No.
17   Q.     BY MS. REKHI:  Do you recall him saying -- Agent
18   Fitzpatrick saying that it would slow things down?
19   A.     No.
20   Q.     Now at this point, you did not advise the defendant of
21   his Miranda rights, correct?
22   A.     No.
23   Q.     And prior to this, did you at any point tell him that
24   he did not have to speak with you?
25   A.     No.
```

1   Q.      Roughly how long was this whole interaction with the

2   defendant on December 4, 2007?

3   A.      Maybe 40, 45 minutes.

4   Q.      From the initial questioning at the residence

5   including the pretext call?

6   A.      The -- are you talking about the pretext call between

7   John Ngo earlier in the morning to Mr. Blanford as well?

8   Q.      No, the pretext call from Mr. Blanford to John Ngo.

9   A.      From Mr. Blanford --

10  Q.      Or to Chris Tom.  I'm sorry.

11  A.      Okay.  So from the time I knocked on the door till we

12  parted at the -- with the pretext call between Blanford and

13  Chris Tom was probably well in excess of an hour and a half.

14  I mean, I'm thinking it probably took us a good at least 20,

15  25 minutes to drive from his house to the location.  And it

16  was about a 45-, 40-minute interview at his house.  So at

17  least an hour and a half.

18  Q.      So using the conservative estimate of an hour and a

19  half, did you at any point tell Mr. Blanford that he did not

20  have to speak to you or Agent Fitzpatrick?

21  A.      No.

22  Q.      Did you at any point tell him that he did not have to

23  cooperate with you?

24  A.      No.

25  Q.      And, of course, you did not advise him that he had the

1    right to an attorney, correct?

2    A.       No.   He wasn't in custody.

3    Q.       You testified earlier that the pretext call to Chris

4    Tom was not successful.   Your intention for the pretext call

5    was to either get the defendant to make incriminating

6    statements or to have Chris Tom make incriminating statements,

7    correct?

8    A.       Would be to have Chris Tom make incriminating

9    statements.

10   Q.       And you testified earlier that you provided an outline

11   for the defendant or Agent Fitzpatrick provided an outline for

12   the defendant to use?

13   A.       I believe that Chris either wrote some things down or

14   talked to him about general topics of which they could

15   address.   I wasn't as familiar with the case, so I didn't know

16   necessarily what Chris Tom's involvement was, so I didn't know

17   what questions to ask or have Mr. Blanford ask.

18   Q.       But Agent Fitzpatrick either coached or wrote

19   something down for the defendant to use?

20   A.       I believe that's probably true, yes.

21   Q.       Do you know if he saved those notes?

22   A.       I do not.

23   Q.       Now at the point that -- you testified earlier Mr.

24   Blanford's wife arrived at the residence, and you testified

25   earlier as well that he made a statement to her along the

1  lines of I'm in trouble, correct?

2  A.      Something like that, yes.  I believe that's -- I heard

3  the word "trouble," I do recall that.

4  Q.      And as you've testified earlier, you've had an

5  opportunity to review the report that was prepared by Agent

6  Fitzpatrick, correct?

7  A.      Yes.

8  Q.      Is that in that report?

9  A.      I didn't see that, no.

10  Q.      Now, when you heard the defendant say that, did you at

11  this point advise him that he has a right to an attorney?

12  A.      No.

13  Q.      Did you advise him that whatever he says or does can

14  be used against him?

15  A.      No.

16          MS. REKHI:  Nothing further, Your Honor.

17          THE COURT:  Any redirect?

18          MS. RIMON:  No, Your Honor.

19          THE COURT:  Thank you, Mr. Sommercamp.  You may step

20  down, and you may leave the courtroom.

21          Any other witnesses?

22          MS. REKHI:  None for the defense, Your Honor.

23          MS. RIMON:  No, Your Honor.

24          THE COURT:  As I understand the issue with regard to

25  the statements made at the defendant's home, it is whether the

1    defendant was in custody as that term has been discussed by

2    the Supreme Court in Miranda and subsequent cases and by the

3    Ninth Circuit in Craighead.

4            As I read Craighead, there are a number of factors

5    which the Court is required to take into consideration in

6    determining whether the defendant was in custody for purposes

7    of Miranda, so I assume that you want to address those factors

8    in your arguments to the Court.  Is that correct?

9            MS. REKHI:  That's correct, Your Honor.

10           THE COURT:  All right.  Then you may proceed.

11           MS. REKHI:  Just one moment, Your Honor.

12           Your Honor, in applying --

13           THE COURT:  Why don't we take a break.  It's 10:30,

14   that's the right time to take a break anyway.  Why don't we

15   take a break, and you can organize your notes, and we can hear

16   what you have to say in 15 minutes.

17           MS. REKHI:  Thank you, Your Honor.

18           (Recess taken.)

19           THE COURT:  The defendant is present.  Ms. Rekhi, you

20   may proceed.

21           MS. REKHI:  Thank you, Your Honor.

22           MR. CARDOZA:  Your Honor, before she does -- I

23   apologize to the Court -- if it's all right with the Court, at

24   11:00 o'clock I've got to step out.  Ms. Rekhi, of course,

25   will be here for the entire motion.

1          THE COURT:  Okay.

2          MR. CARDOZA:  Thank you.

3          MS. REKHI:  Your Honor, in applying the factors laid

4   out in Craighead, I'll start with the fourth factor, which is

5   most easily dealt with I think.

6          Both the government and the defendant are in agreement

7   that at no point was the defendant advised that his

8   statements -- that he did not have to speak with the agents or

9   that he was free to leave.  I believe that the government

10  concedes as much in their moving papers.

11         Now, addressing the first factor, the number of law

12  enforcement personnel that were present and whether they were

13  armed, Mr. Blanford was home alone at the time that the agents

14  arrived.  Both the agents testified that they were armed.  Mr.

15  Blanford testified that at least -- he was aware that at least

16  one of the agents was armed.  I believe that the factor is met

17  as the agents outnumber Mr. Blanford.

18         In -- in particular I don't think it's -- as the Court

19  stated earlier, it's not so much whether the fear is that the

20  agents will shoot Mr. Blanford, but whether it contributes to

21  a factor of intimidation for the defendant, which I believe

22  that it did.

23         In addition, the testimony from the defendant was that

24  he did not invite the agents in.  Agent Fitzpatrick stated

25  that the defendant invited them in, whereas Agent Sommercamp

1    testified that once they asked if they could speak with him,

2    the defendant allowed them to come in.  I don't believe that's

3    a -- it may be an implied consent if stretched, but I don't

4    think that is an invitation for the agents to come in and

5    question him.

6          The second factor as to whether the suspect was at any

7    point restrained either by physical force or by threats, I do

8    believe that Mr. Blanford was -- even though he was not

9    physically placed in handcuffs, he was restrained.  He -- the

10   testimony is that -- from Mr. Blanford is that several threats

11   were made to him including that he was going to go to jail,

12   that the agents were aware that he was lying.

13         I believe in U.S. versus Kim -- and let me give the

14   case citation -- 292 F.3d 969, and in Stansbury versus

15   California, 511 U.S. 318, although the intention of the agents

16   is not relevant, what is relevant is whether they conveyed

17   that intention or that suspicion to the defendant and how that

18   contributes to his state of mind.

19         In this case, the agents came prepared with

20   confronting Mr. Blanford of what evidence they believed they

21   had against him or with John Ngo.  Both the agents testified

22   that they showed Ngo -- they showed Mr. Blanford a copy of the

23   complaint against Ngo, which of course would rise to

24   pressuring or forcing Mr. Blanford to cooperate with them.

25         In addition, the defendant testified that several

1    statements were made to him to the effect that if he did not

2    cooperate, he would go into -- that he was going to jail, that

3    he was going to take the fall for all this alleged fraud.

4         As to the third factor, whether the suspect was

5    isolated from others or not, there's testimony that Mr.

6    Blanford's wife was at the residence.  However, even though

7    she's present physically in the residence, she is not there to

8    support Mr. Blanford.  He only has limited interaction with

9    her, and it's to the extent, hey, based upon what the agents

10   testified to, that he's in trouble, and then Mrs. Blanford

11   subsequently goes upstairs with the children.

12        THE COURT:  Do you think it makes a difference whether

13   the agents were the ones that isolated Mr. Blanford from his

14   wife or whether he is the one?

15        MS. REKHI:  According to Craighead, there is -- the --

16   the way the court analyzed that factor was there an individual

17   that was present who could have provided moral support to the

18   defendant.  However, this defendant was not allowed into the

19   alleged storage room or this area when the defendant was being

20   questioned.

21        I believe that it is a factor in the sense that the

22   agents created such a hostile environment that Mrs. Blanford

23   was not -- a person would not have been comfortable being in

24   that area, so effectively isolating Mr. Blanford from any

25   moral support that he would have had.  In addition, there's

1    always the concern of how much is he to subject his wife and

2    children to.  So the questioning was such that it did isolate

3    Mr. Blanford from his wife or any moral support that he might

4    have had.

5         Of most importance is when the questioning got heated

6    and the defendant asked if he could -- this is disputed --

7    whether he could talk to an attorney, there was active

8    subterfuge that the agents engaged in in dissuading him from

9    talking to an attorney.  Agent Sommercamp testified that he's

10   not an attorney and he's not there to tell him whether to get

11   an attorney or not.  However, the matter is, if the defendant

12   invokes his right to speak to an attorney, his responsibility

13   is to inform him of his rights, and that being that he does

14   have the right to have an attorney and to speak with him.

15        If --

16        THE COURT:  Well, the testimony from Agent Fitzpatrick

17   was not that the defendant invoked his right to an attorney,

18   it was that he inquired whether he should have an attorney.

19        Now do you think the case law imposes an obligation on

20   the officers to give a Miranda warning under those

21   circumstances?

22        MS. REKHI:  I believe when the defendant invokes the

23   right to a -- to speak with an attorney in that situation,

24   yes, Miranda applies, there is an obligation to inform him of

25   his -- the questioning must stop, and the defendant must be

1    informed of his rights under Miranda.

2          THE COURT:  No, but you didn't answer my question.  I

3    said Agent Fitzpatrick's testimony is not that the defendant

4    invoked his right to counsel.  Agent Fitzpatrick's testimony

5    is that the defendant inquired as to whether he should have

6    counsel.

7          My question to you is, do you think the case law

8    imposes an obligation on the officers under those

9    circumstances?

10         MS. REKHI:  The current case law is that unless it's

11   an -- if it is an uncontested decision to request -- request

12   an attorney, then that's when the right applies.  But in

13   support of the third factor --

14         THE COURT:  Well, I'm not sure that's an answer to my

15   question.

16         Is there any case law on the question of what the

17   obligation of the officers is when the defendant inquires

18   whether they think he should have an attorney?

19         MS. REKHI:  I believe the obligation when he inquires

20   is that the agents should inform -- they're not to mislead,

21   but to inform that -- of his rights.  If he desires to speak

22   with an attorney, it is his right to speak with an attorney.

23         THE COURT:  Well, I understand that.  What I just

24   heard you say may be the case law.  I would be interested if

25   you have any specific cases one way or the other on it.

1          The question is, when the officers have not yet

2     informed the defendant of his Miranda rights either because

3     he's not being interrogated or he's not in custody or for

4     whatever reason they might think they don't have to advise him

5     of his Miranda rights, but during the interview he asks

6     whether they think he should have an attorney, does the law

7     impose upon them an obligation at that time under those

8     circumstances to give a Miranda warning?

9          MS. REKHI:  Your Honor, I have not -- other than

10    Miranda, which I believe has been subsequently eroded in many

11    ways, if we just consider Miranda, yes, there is an obligation

12    on behalf of the agents to inform the defendant that he does

13    have the right to an attorney.  However, I'm not sure how the

14    case analysis has been subsequent to that.

15         Miranda has been very clear as to what rights the

16    defendant should be given when he faces a custodial

17    interrogation.  And if I were to just apply that, I believe

18    the answer is yes.  I do not have any other case law to

19    support what the subsequent analysis of that is.

20         THE COURT:  It's interesting because I can imagine

21    courts going every which way on the question given a situation

22    where an original Miranda warning was not required because,

23    for example, the defendant is not in custody, but after some

24    questioning the defendant asks whether he should have a

25    lawyer.  Does the law then impose upon the officers a duty to

1   advise the defendant of his Miranda rights?  That would be a

2   question that I could see the courts going every which way on,

3   and they probably have.

4          MS. REKHI:  Well, in order to -- looking at the

5   circumstances, I think what is clear is that the agents should

6   not be engaging in subterfuge to prevent the defendant from

7   obtaining counsel.  And I think that's clear in Miranda, that

8   that's one of the reasons why the state of mind of the officer

9   is not relevant.  What is relevant is their conduct in which

10  it would have led the defendant to believe of his or her

11  rights and whether that person, the defendant is free to leave

12  or free to end the interrogation.

13         So if the agents try many different ways to evade that

14  answer, then of course it goes towards the custodial

15  interrogation aspect of the -- for the defendant.

16         If -- you know, unless the defendant specifically

17  asked the question can I get an attorney, and the agents reply

18  yes or no.  But if he asks a variety of that question, then it

19  gives the agents leeway to evade that answer.  I mean, in

20  applying Miranda, I would say that the obligation would have

21  been with the agents to inform him of his rights.

22         And the reason I specifically pointed to that is, it's

23  another way for the agents to prevent Mr. Blanford from

24  speaking to counsel or obtaining any legal advice.  They are

25  effectively isolating him.  And that's also shown by how

1    quickly they try to get him to make the pretext call even

2    though there were jurisdictional concerns.  Whatever they may

3    be for the agents, they did their best to get Mr. Blanford

4    under their control, to drive out to an unknown location and

5    to conduct the pretext call.

6           And of most significance is that they didn't -- as

7    Agent Fitzpatrick testified, the defendant signed the

8    voluntary consent form after the pretext call had been done,

9    again acknowledging that, you know, on a superficial level the

10   defendant was advised, but what is the value of that advice if

11   it's given after the action has already been taken.

12          Unless there's something additional that the Court

13   wants me to address, I will submit.

14          THE COURT:  Thank you.

15          Ms. Rimon.

16          MS. RIMON:  Thank you, Your Honor.

17          Defendant's motion raises two issues, although we've

18   been primarily talking about the -- or the request to preclude

19   statements made by the defendant during the interview.  The

20   basis for that request, as you know, is that there were no

21   Miranda warnings issued, and the question is whether defendant

22   was in custody.

23          The second question is whether the call, the pretext

24   call to Mr. Tom should be suppressed.

25          THE COURT:  Let's talk about the first question, then

1    we can address the second one a little later.

2          MS. RIMON:  Okay.

3          With respect to the statements, the Craighead factors

4    are obviously controlling.  And the issue is whether --

5          THE COURT:  Well, they're not that obviously

6    controlling because in a footnote in Craighead the Ninth

7    Circuit points out that they're not limiting the inquiry to

8    those factors and that other circuits have suggested other

9    factors.  So it's not necessarily limited to the Craighead

10   factors.

11         MS. RIMON:  You're correct, Your Honor, there are

12   others even within the Ninth Circuit, but those are the ones

13   that have been highlighted for an in-home examination of

14   whether an interview was custodial.

15         THE COURT:  Is it correct that Craighead is the only

16   Ninth Circuit case dealing with an in-home interrogation on

17   the question of whether it's custodial?

18         MS. RIMON:  I -- that's the only Ninth Circuit case.

19   There have been obviously district court cases in the Ninth

20   Circuit since then.  Prior to that was U.S. versus Kim, which

21   is not particular to an in-home interrogation.  So I think

22   that is the outstanding Ninth Circuit case on the issue.

23         And under that, the primary focus is whether there has

24   been a police-dominated atmosphere that's been created during

25   the interview, and the first factor is the number of law

1  enforcement.  And here the number of law enforcement was two,

2  that never changed.

3          In Craighead, for example, there were eight law

4  enforcement officers that were there in flak jackets and with

5  weapons shown.  It's a very different situation from the

6  situation here.

7          THE COURT:  Well, it is and it isn't.  Two is not

8  eight, but two is more than one.  And there was one defendant

9  with his wife in another room and two agents, both of whom are

10 armed and that may be relevant simply to the show of force,

11 although I just don't understand why courts of appeals put so

12 much weight on that, as I've suggested.

13         But they dominated the -- they were a majority of the

14 people present.

15         MS. RIMON:  Well, that's true, Your Honor.  And I

16 think in Craighead and the cases that I've looked at since --

17 the issue since then, it's not a simple numbers game.  Most of

18 the cases that I looked at that have come since Craighead had

19 more than two agents and still found that no custody occurred.

20         It's all --

21         THE COURT:  Why do you say that?  Because I haven't

22 seen those cases.  Now why do you cite cases that you haven't

23 cited to me?  Where are those cases?

24         MS. RIMON:  Your Honor --

25         THE COURT:  The only case that I've seen is Craighead.

1    That's the only one in the Ninth Circuit that's been cited to

2    me.  You tell me there are other district court cases in the

3    Ninth Circuit that have addressed the issue.  You haven't

4    cited them to me.

5         MS. RIMON:  That's right, Your Honor.  I did not have

6    an opportunity to do it because the defendant's initial motion

7    did not even clarify exactly what the issues are, did not

8    address the Craighead factors, and did not submit a proper

9    basis to even have an evidentiary hearing.  It would have been

10   proper for the Court not to have an evidentiary hearing.

11        THE COURT:  Well, it would have been proper if you

12   want to take the chance of getting it reversed for not having

13   an evidentiary hearing.  But we had the time to do it, and so

14   it was prudent to have all the facts before the Court.  Even

15   without an evidentiary hearing, most of the facts at least in

16   the light most favorable to the government were already known

17   to both sides.

18        MS. RIMON:  I don't disagree with having the hearing,

19   Your Honor, but I'm trying to explain -- I would have liked

20   the opportunity to reply more fully and to cite the cases that

21   we found since the defendant found -- or filed their reply

22   brief.

23        THE COURT:  Well, why don't I let you do that, then.

24   Because we're not going to be able to finish jury selection

25   today, I doubt, so we can come back and address this before

1    you make your opening statements.

2            MS. RIMON:  That would be fine, Your Honor.

3            THE COURT:  I'm willing to do that.

4            I also would like to have any further enlightenment

5    that you can provide in particular in terms of case law on the

6    question that I raised, which is what is the obligation of the

7    police officer who begins questioning without a Miranda

8    warning because it is not deemed to be custodial

9    interrogation, when the defendant during the course of the

10   interview inquires whether he should have a lawyer.  Does the

11   officer then have an obligation to inform the defendant of his

12   Miranda rights even though he didn't have that obligation at

13   the beginning?  I'd like to have a little bit more edification

14   on that question.

15           MS. RIMON:  We'll address that as well.

16           THE COURT:  Now, on the second point that you raise,

17   my concern is not Miranda on the second issue of whether the

18   pretext call is admissible.

19           To me, it is analogous to an undercover buy where

20   police officers approach a suspect, and they may have the

21   goods on him, and by one means or another they persuade him to

22   cooperate and to go undercover with a wire and make a buy.

23   They tell him that the object is not to entrap the other

24   suspect, but to persuade him if he is ready and willing to do

25   so, to sell narcotics.

1          Now we all know that subterfuge is entirely

2     permissible under those circumstances.  There is a jury

3     instruction to that effect, that officers and cooperating

4     witnesses are permitted to use subterfuge.  So it is fully

5     anticipated that the individual who is cooperating is going to

6     lie.  He's going to try to create a situation to get the other

7     person to sell him drugs.  So he goes out and he says, hey,

8     I'm a big time drug dealer, I've got a lot of money, I've been

9     making a lot of buys like this from people like you all the

10    time, and let's see what we can do.  It may not be true, but

11    that's generally understood to be an appropriate way to get

12    the other person to sell drugs.

13         Now it's analogous here, it seems to me.  They come up

14    to him, and by Mr. Sommercamp's testimony as well as Mr.

15    Fitzpatrick's, they coached the defendant.  Mr. Sommercamp

16    says that Mr. Fitzpatrick wrote something down for the

17    defendant to say.  But either way they're telling him this is

18    the object of this telephone call.  Mr. Fitzpatrick said that

19    it was to corroborate the information that other people were

20    paying John Ngo.

21         It doesn't seem to be probative to offer evidence of

22    what the defendant said to do that.  It's not proof of the

23    truth of the matters asserted.

24         MS. RIMON:  Your Honor --

25         THE COURT:  So you can answer that.  That's the

1   testimony I have, that they wanted him to get the defendant,

2   Mr. -- the people he was calling to corroborate information.

3   And he said that he told them it would be a lie, and they said

4   it's okay to lie.

5         Now, that's his testimony.  I don't have to believe

6   it.  But that part of his testimony is not necessarily

7   incredible because an agent knows that it's okay to lie when

8   you're doing something like that.  And so if he had said,

9   well, if I say that it's going to be a lie, I can imagine the

10  agents saying that's okay, that's okay.  That would be

11  perfectly appropriate.

12        MS. RIMON:  Your Honor, I think the Court is right

13  that it's a question of whether it's probative.  These are

14  statements of the defendant that we're offering, and I think

15  the issue is are they statements of the defendant?  It's a

16  very fact specific question, and it's going to be a matter of

17  the weight of the testimony.

18        And there are facts that are not before the Court yet.

19  For example, there were two recorded calls, as the Court has

20  heard, between John Ngo and Mr. Blanford.  Some of the

21  information in those calls, which were Mr. Blanford's

22  statements without having agents present or having talked to

23  agents at all, I believe are somewhat reflective of things he

24  says in his own call that he makes to Mr. Tom.

25        THE COURT:  Well, there's no motion to suppress those

1    other calls, so you're not prohibited as of now from offering

2    evidence of those other calls.

3            MS. RIMON:  But my point, Your Honor, is that after

4    hearing those other two calls and then hearing the third call,

5    I think it will become a little bit clearer that those

6    statements are not just a script that the agents gave to Mr.

7    Blanford, but they actually came from himself, and I think

8    it's a matter for the jury to decide what weight to give those

9    statements, if any.

10           THE COURT:  Let's do this.  Since there's no objection

11   as of yet to the other two telephone calls, you can refer to

12   those in your opening statement.  But I will not allow you to

13   make any reference in your opening statement to this telephone

14   call unless and until during the trial you ask me to

15   reconsider and, if I change my mind, then you can ask the

16   questions.  All right?

17           MS. RIMON:  Your Honor, may we brief that issue as

18   well in the brief that we're going to provide --

19           THE COURT:  I don't have time to read the brief.

20           MS. RIMON:  It wasn't --

21           THE COURT:  You can tell me orally.  I mean, I don't

22   need to have everything in writing.  I can listen.

23           MS. RIMON:  But there may be --

24           THE COURT:  I thought I listened to everything you had

25   to say, and I thought what I was proposing was fair.  In other

1 | words, I'm saying I'll reconsider if after I hear the evidence
2 | of these other phone calls it persuades me that the
3 | prejudicial effect of the one that's being discussed now is
4 | not as great as I think it is.  Because, quite frankly, it is
5 | a Rule 403 consideration that causes me to believe that you
6 | should not be allowed to offer that statement.
7 |         MS. RIMON:  That's fine, Your Honor.
8 |         THE COURT:  I think that's fair.  I don't need another
9 | brief.  If you have anything more to say, I'll hear it, but it
10 | doesn't have to be in writing.
11 |         MS. RIMON:  I just -- I want to -- because that issue
12 | was not squarely before the Court, it's something I haven't
13 | researched as well as I would like to, but we can address it
14 | later in the trial.
15 |         THE COURT:  All right.  I can appreciate that.  I may
16 | reconsider if you present that to me outside the presence of
17 | the jury before you make any reference to it.
18 |         MS. RIMON:  Thank you, Your Honor.
19 |             (End of requested proceedings)
20 |                   ---o0o---
21 |
22 |
23 |
24 |
25 |

1          I certify that the foregoing is a correct partial

2     transcript from the record of proceedings in the

3     above-entitled matter.

4

5

                              /s/ Kathy L. Swinhart
6                             KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25