IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---o0o---


UNITED STATES OF AMERICA,


              Plaintiff,


vs.                                    No. Cr.S. 08-0269


JOEL BLANFORD,


              Defendant.

_____/


---o0o---

REPORTER'S PARTIAL TRANSCRIPT

EVIDENTIARY HEARING

ON DEFENDANT'S MOTION TO SUPPRESS

VOLUME 2

TUESDAY, JUNE 22, 2010

---o0o---


Reported by:   KATHY L. SWINHART, CSR #10150

1                                APPEARANCES

2


3       For the Plaintiff:

4               BENJAMIN B. WAGNER
                United States Attorney
5               501 I Street, Suite 10-100
                Sacramento, California  95814
6               BY:    LAUREL LOOMIS RIMON
                       PAUL A. HEMESATH
7                      Assistant U.S. Attorneys

8

        For the Defendant:
9

                THE CARDOZA LAW OFFICES
10              1220 Oakland Boulevard, Suite 200
                Walnut Creek, California  94596
11              BY:    MICHAEL E. CARDOZA
                and    JYOTI K. REKHI
12
                Also Present:
13

                       JOEL BLANFORD
14

                       CHRIS FITZPATRICK
15                     Federal Bureau of Investigation

16

17

18

19

20

21

22

23

24

25

1                       SACRAMENTO, CALIFORNIA

2                TUESDAY, JUNE 22, 2010, 2:02 P.M.

3                            ---o0o---

4           (The following proceedings were had outside

5           the presence of the prospective jurors:)

6           THE CLERK:  Calling criminal matter No. 08-269, the

7    United States versus Joel Blanford.

8           THE COURT:  The defendant is present with counsel.

9           Ms. Rimon, I received your letter this morning.  It

10   is, I presume, the subject you wanted to discuss ex parte.

11          MS. RIMON:  That's correct, Your Honor.

12          THE COURT:  I don't think an ex parte discussion would

13   be appropriate.  I propose that I simply tell Mr. Cardoza the

14   subject of the letter and let you two decide how much of it I

15   ought to put on the record.

16          Does that sound appropriate?

17          MS. RIMON:  We can do that, Your Honor.

18          THE COURT:  It is a letter which advises the Court

19   that Mr. Fitzpatrick, in connection with a job interview --

20          MS. RIMON:  Your Honor, I'm sorry to interrupt, but

21   may I make one request, please?

22          THE COURT:  Yes.

23          MS. RIMON:  I'd just like to ask that if any of the

24   facts are going to be disclosed or put on the record that we

25   could seal the court.  It's a sensitive and private matter,

1    and I don't think it needs to be aired publicly.

2             THE COURT:  Well, I don't know.  It's not important to

3    me.  It's only important to the extent that we preserve an

4    appearance of a public record in a criminal trial.  I think

5    it's explained.  I don't think that it's anything that anybody

6    ought to be embarrassed or ashamed about.

7             MS. RIMON:  I agree, Your Honor.  But it is -- it is a

8    sensitive matter.  I think there would be a basis to seal the

9    record as to this matter.  It can be discussed with Mr.

10   Cardoza, as I indicated in our letter.  I don't think it's

11   necessarily subject to disclosure or even necessarily

12   relevant, but we can advise Mr. Cardoza of that.  I would just

13   ask that it be kept sealed because it is sensitive and very

14   personal, and it's really not a subject for public disclosure

15   nor does it really bear on the proceedings in this case.

16            THE COURT:  All right.  What I'll do then is ask

17   everyone else to leave the courtroom.  I'll hold these

18   proceedings in camera subject to being made public in the

19   event that someone later so requests.

20            Is that all right?

21            MS. RIMON:  Yes, Your Honor.

22            THE COURT:  All right.  Then everyone who is not a

23   party to this case should leave the courtroom at this time.

24            (In camera hearing held.)

25            THE COURT:  Now, I received the government's

1    supplemental brief and the defendant's response.

2          There's a new case that I think you need to address

3    because we were talking about the Craighead factors, and

4    that's all we were talking about in terms of the decision as

5    to whether the defendant was in custody at the time of the

6    interrogation.  The government now cites Kim, which has five

7    new factors, and they're not the same as the other four

8    factors, they're completely different.  So now I don't know

9    whether we have a four-prong test, a five-prong test or a

10   nine-prong test or some other test.

11         But I think you at least need to talk about the Kim

12   factors, and I'll give each of you an opportunity to tell me

13   how you think the evidence that I have heard applies to the

14   five-prong Kim test.

15         Who wants to go first on that?

16         I wasn't aware of the Kim test when I was listening to

17   the testimony, so I wasn't taking notes -- for example, I

18   didn't take notes of the language used to summon the

19   individual.

20         MS. RIMON:  Your Honor, I'm happy to address it.

21         THE COURT:  All right.

22         MS. RIMON:  I have seen at least one case, although I

23   can't -- I believe it's one of the ones that was cited in the

24   government's briefs -- without looking, which I can do, I

25   don't know exactly which one -- but that referred to a

1    nine-part test.

2          The way I understand it from reading the cases that

3    the government has cited in our brief is that the Kim factors

4    are generally applicable to questions of whether an

5    interrogation was custodial.  But since Kim, Craighead was

6    decided and put a finer point on the issue in terms of looking

7    at whether there was a police-dominated atmosphere that in a

8    sense take the place of the Kim factors.  Although I think the

9    Kim factors are in the background, they just don't apply as

10   clearly to an in-home interview situation.

11         And both under Kim and under Craighead, the court is

12   very clear that these are not exhaustive factors in any case.

13   So I don't think that there's a per se nine-part test to look

14   at in any custodial situation.  But the Court should keep in

15   mind the general analysis under Kim of whether an

16   interrogation is custodial, some of which factors don't apply

17   to an in-home situation.

18         For example, the first factor under Kim, the language

19   used to summon the individual just doesn't apply.

20         THE COURT:  Well, actually it could.  Because I think

21   the language used by the officers when they encounter the

22   individual at the doorstep would probably be quite appropriate

23   for an in-home interrogation.  In other words, at one extreme,

24   you have the defendant's testimony here that they just barged

25   in.  And at the other extreme, you could have them saying we'd

1    like to talk to you, would now be a good time or would you

2    like to come down to the station or would you like not to talk

3    to us at all; in other words, leaving it completely up to the

4    individual.

5         So I think the language that they use in order to gain

6    entry or to initiate the interrogation could be very relevant

7    in an in-home situation.  But I just don't recall exactly what

8    the agents' testimony was.  I do tend to recall the

9    defendant's testimony.

10        MS. RIMON:  The agents testified that they knocked on

11   the door, they asked the defendant whether they could speak to

12   him, and he allowed them -- or invited them, the agents I

13   believe testified that they were invited in to the home and

14   led to a dining table to discuss the issues that they had

15   raised.

16        THE COURT:  Did they say anything more about the

17   language used?

18        MS. RIMON:  I'm sorry, Your Honor.  Who are you

19   referring to?

20        THE COURT:  No, language -- I'm sorry.

21        MS. REKHI:  Your Honor, maybe I could address that.

22        THE COURT:  I'm sorry.  I'm having a hard time making

23   myself understood.  It's frustrating.  I said language used.

24        MS. RIMON:  I just want to make sure to answer the

25   Court's question.

1              THE COURT:  I know, but I'm frustrated because people

2     can't understand me.  Maybe there's something wrong.

3              MS. RIMON:  I think I'm just being overly -- wanting

4     to be overly precise.  I don't think you were unclear, Your

5     Honor.  I think -- I just want to make sure whether you're

6     asking about the agents' testimony or what the courts were

7     referring to.

8              THE COURT:  Well, all right.

9              My recollection from my notes is that Mr. Fitzpatrick

10    testified that Agent Sommercamp showed his credentials and had

11    a badge on his waistband, and Agent Sommercamp said that he

12    wanted to ask the defendant some questions.  Now those are my

13    notes from his testimony.  So that may be all the evidence

14    that we have as to what language was used when they initiated

15    the interrogation.

16             Do you have any other recollection of what language

17    was used when the interrogation was initiated?

18             MS. RIMON:  Your Honor, I know that both Agent

19    Sommercamp and Agent Fitzpatrick were asked whether they

20    insisted on entering the home, and they said -- they both said

21    that they were invited in by Mr. Blanford.  I don't believe

22    they gave, you know, specific testimony about what he said but

23    that they were invited in his home.

24             THE COURT:  All right.  Well, that's a little vague.

25    That could be any number of things.  You can invite someone

1    with body language.  You can invite them by saying come in.

2    You can invite them by saying okay.  I don't really know if

3    there's any testimony as to what the language used was other

4    than Agent Sommercamp saying he wanted to ask the defendant

5    some questions.

6            So go ahead.

7            MS. RIMON:  Your Honor, I think that the Kim

8    factors -- I mean, the cases that have -- that we cited in our

9    brief and I believe that the defendant addressed at all

10   speaking about the Craighead factors, in those cases Kim is

11   referenced, but generally the Kim factors are not specifically

12   addressed, just the Craighead factors are addressed.  And I

13   think that's because in this area, the court -- the Ninth

14   Circuit has held that it's a totality of the circumstances,

15   and they're looking at overall what the circumstances were,

16   and these are factors to aid in that discussion.  And so to

17   some extent, the Kim factors and the Craighead factors

18   overlap.

19           For example, under Kim, the third factor is the

20   physical surroundings of the interrogation.  And under

21   Craighead, you know, whether there is restraint has generally

22   been analyzed in terms of the setting of the interrogation.

23   There's discussion in the case law about whether the interview

24   was conducted in a person's kitchen or den.  And I think

25   Craighead specifically held that familiar surroundings such as

1    a den or a living room are indicative of a lack of restraint.

2            And so I think the factors somewhat --

3            THE COURT:  But if you're in the defendant's home,

4    what difference does it make whether you're in the den or the

5    kitchen?  They're both familiar to the defendant.

6            MS. RIMON:  Well, I don't think there is a difference

7    between the den or the kitchen, but Craighead and courts

8    following it have specifically looked to where the interview

9    took place.  And they have found, for example, in Craighead

10   that a storage room in the back of the house was a factor

11   leading to a finding of custody.  There's another case that we

12   cite where an individual was in that case handcuffed in a back

13   room in his apartment, and that was considered to be

14   custodial.

15           But there's been specific references in both

16   Craighead, and we cite that language in our brief I believe,

17   and other cases that talk about how the living room or

18   specifically the den and the kitchen are familiar settings

19   where you might sit down with an invited guest.  And so that

20   factor weighs in favor of a finding of a non-custodial

21   situation.

22           So I don't necessarily think the Court needs to

23   address new evidence or -- or do a new analysis specifically

24   under the five Kim factors.  All of the cases that we've cited

25   I believe address primarily or only the Craighead factors.

1    But the Kim factors are what -- are the basic Ninth Circuit

2    law on whether an interrogation is custodial.

3         THE COURT:  Well, you do cite Kim, and you do mention

4    the Kim factors in your brief.

5         MS. RIMON:  I did, Your Honor, because I wanted the

6    Court to be aware of where the starting point is for a

7    custodial determination.  And Craighead cited Kim, and I think

8    it's appropriate to look at that as the backdrop for

9    determining whether custody existed.

10        But, again, in Craighead the court specifically looked

11   at an in-home situation and found that the Kim factors didn't

12   address the entire situation and so determined that one should

13   look at whether a police-dominated atmosphere existed and then

14   set out the four factors that it did.  So I don't think the

15   inquiry is complete without being aware of the Kim factors,

16   but I don't think that the Court is required to specifically

17   address those, or at least I haven't seen that in the district

18   court decisions that have occurred since Craighead.

19        I think what Craighead does is say in an in-home

20   situation what the Court should look to is whether a

21   police-dominated atmosphere exists, and it gives four factors

22   which are not exhaustive that may be considered.  So I think

23   if the Court found any of the four Craighead factors or any of

24   the five Kim factors or any factor that's not in any of those

25   lists was informative on the subject, that the Court could use

1    any of those factors.

2           THE COURT:  What relevance, weight or importance in

3    the Craighead analysis does the question of whether a

4    reasonable person would feel free to leave have?  That was, as

5    I read it, the ultimate question in Kim.  What relevance does

6    that have in the Craighead analysis?

7           MS. RIMON:  I think that has significant relevance.  I

8    think that Craighead is based on the Kim court's decision

9    that -- or holding that it's an objective and not subjective

10   standard.  And that was addressed in a recent case that we

11   cited, the District of Oregon case, U.S. versus Krstic.

12          I mean, Kim did clearly hold that it is an objective

13   standard that the Court should look to.  Craighead I think in

14   referencing Kim, part of that was to establish what the

15   standard was.  And courts that have looked at the Craighead

16   factors since then have looked at whether -- what a reasonable

17   person in that situation, not specifically the defendant,

18   would have felt.  And as I mentioned, the Krstic case, which

19   is a 2010 decision with similar facts, address the objective

20   versus subjective nature of the inquiry.

21          THE COURT:  This may be an oversimplification of Kim

22   and Craighead, but it seems that the five factors in Kim are

23   all aimed at the ultimate question of whether a reasonable

24   person would have believed that he could freely walk away from

25   the interrogators.

1              It seems like the four factors in Craighead are aimed

2      at the ultimate question of whether the home was a

3      police-dominated atmosphere; more specifically whether the

4      interrogation turned the otherwise comfortable and familiar

5      surroundings of the home into a police-dominated atmosphere.

6              The court in Craighead noted that when you're in

7      somebody's home, obviously the question is not whether they

8      could freely walk away.  But the analogous question might be

9      whether a reasonable person under the circumstances would have

10     believed that he could have told the officers to walk away.

11             Do you think that the Court in a home interrogation

12     situation should be asking both of those questions or just the

13     Craighead question?

14             MS. RIMON:  The way I read the cases and the decisions

15     since Craighead, and what I think makes the most sense, is for

16     the Court to start with the Craighead factors.  If those don't

17     completely address the issue, I think the Court might fall

18     back on whether the Kim factors do.  But in both cases the

19     court is very clear that these may not be the only factors to

20     look at.  You may still find custody or not custody even if

21     you find one of these factors to be present or not.  So it's a

22     bit fuzzier maybe than -- than one would like.

23             But I --

24             THE COURT:  The factors are non-exhaustive and

25     flexible, but the ultimate question seems to be the same in

1    each case.

2          In other words, in the Craighead situation, the Court

3    may look to the four Craighead factors, may look at some other

4    factors, but the Court is still in every case going to be

5    addressing the bottom line as to whether the circumstances of

6    the interrogation amounted to a police-dominated atmosphere.

7          MS. RIMON:  That's correct.  And I think as the Court

8    just said, I think the police-dominated atmosphere is an

9    adjustment of the standard of whether a reasonable person

10   would have believed they could freely walk away for the

11   different circumstances of being in a person's home.  So I

12   think it's just flipping the question that was -- that was

13   raised in Kim or the standard that was raised in Kim to fit

14   more specifically in in-home situations.

15         THE COURT:  All right.  It's sometimes difficult for

16   the Court to know what a reasonable person would do because

17   what I would do and what I would think may not be what a

18   reasonable person would think.  I and you are people trained

19   in the law.  We tend to know what our rights are more than the

20   average person does.  And we're not in touch as much with the

21   views, feelings and beliefs of the average person.

22         How do you suggest the Court go about determining what

23   the reasonable person would believe rather than what I would

24   believe or what you would believe?

25         MS. RIMON:  Your Honor, may I just grab my notes real

1   quickly?

2         THE COURT:  All right.

3         MS. RIMON:  Your Honor, two ways.  One, I think that,

4   first, the cases that we've cited are instructive.  They're

5   dramatically different from the situation here.  And so I

6   think that's helpful in the sense that the cases mostly find,

7   even in the case of search warrants being executed and agents

8   entering the home with weapons unholstered and with raid gear

9   on, mostly find no custody based on a variety of factors.

10        But --

11        THE COURT:  Those are district court cases.

12        MS. RIMON:  That's --

13        THE COURT:  A problem I have with district court cases

14   is that these are simply other judges like myself.  I don't

15   know how they made the decision.  I don't know whether they

16   made the decision based upon what they personally would have

17   believed or whether they used some yardstick that I'm not

18   aware of to determine what a reasonable person would believe.

19        And while I'm on the subject, do you know whether any

20   of those cases are either pending on appeal or went up on

21   appeal?  They're all district court cases, and those

22   particularly that ruled against the defendant I would assume

23   would be appealable unless they went on to be acquitted.  So

24   I'm surprised that they -- I would be surprised if they

25   weren't appealed.  But since they're so recent, I'm not

1   surprised that there's no decision on them.  I was asking

2   whether you knew if they had been appealed, if they're pending

3   on appeal or what happened.

4           MS. RIMON:  I don't know, Your Honor, and I think

5   that's a fair question.

6           I think, as the Court points out, they're district

7   court cases, other judges may view things differently.  But

8   there's enough of them in analyzing Craighead that I think

9   they provide some information on the question of what would a

10  reasonable person feel or do and that there's a general

11  consensus.  I don't think that's the end of the issue.

12          I think that in this case we can look to the actual

13  facts here to see what Mr. Blanford did.  And that's why I

14  think what he did after the interview and how he acted during

15  the interview with respect to feeling free to go upstairs,

16  have a conversation with his wife, follow in his own car for

17  half an hour, that those things are indicative of how he

18  actually felt.

19          THE COURT:  But then, again, as you point out, that's

20  not the test at all.  You're very careful to point out that

21  it's an objective test.  What Mr. Blanford may have personally

22  subjectively believed isn't the test.  It may not even be

23  relevant.

24          MS. RIMON:  It isn't the test, but I think it -- the

25  Court is in a position, and we -- there is no case I've seen

1    that says a court or the lawyers involved in the case because

2    they are more educated on the subject of the law can't use

3    their own judgment to determine whether something, you know,

4    meets an objective, you know, person's standard.

5        And I think it informs that standard.  I don't think

6    it's conclusive.  I do think, though, it aides in the

7    determination of what would a person feel.

8        Because here's a person that, by all indications, is

9    a -- you know, generally functions in society and a reasonable

10   person and we see what he did.  And I don't think that is the

11   end of the inquiry, but I think it's relevant.  And I think

12   the Court, although it may be difficult, is in a position to

13   use its own judgment as to, you know, how a reasonable person

14   would react.

15       And I think aside from that, in looking at the

16   cases -- and, again, they are district court cases, but

17   they're logical, and they make sense.  And even under

18   Craighead, which is a Ninth Circuit case, the facts in

19   Craighead are dramatically different than what we have here.

20   There were eight law enforcement officers conducting a search

21   warrant.  They took the suspect, the defendant to a back

22   storage room in the house, sat him on some boxes, closed the

23   door, barred another military person who was there to be his

24   support from entering the room, and one of the agents who was

25   wearing raid gear was leaning up against the door, which was

1    the only exit from the room.  These are dramatically different

2    facts.

3         Now, in that case, they also did advise the defendant

4    that he was free to leave and free to terminate the interview,

5    which did not happen here.  But, again, no one factor is the

6    deciding factor under this analysis.  So we have at least one

7    Ninth Circuit case that sets out very different factors from

8    here.  And I think if all you look -- the Court looked at at

9    this point were Craighead, I think the appropriate result

10   would be that custody did not occur because the circumstances

11   are so dramatically different.

12        THE COURT:  I don't know.  We only have one Ninth

13   Circuit case in which the court considered whether an

14   interrogation in the defendant's home was custodial, and

15   that's Craighead, and they found that it was.  And so on the

16   other side of the coin is if the only case you had was

17   Craighead, you could make the argument that we've never had a

18   case in which in-home interrogation has been found not to be

19   custodial.

20        MS. RIMON:  It's an area of developing law, and I

21   think the Court can then look to the pre-Craighead cases, and

22   we didn't cite I think more than one of those.

23        THE COURT:  You know, the problem with the

24   pre-Craighead cases is that they didn't know about Craighead.

25        What is your impression?  Do you think Craighead made

1    new law or do you think it simply was a restatement of the law

2    that had existed ever since Miranda?

3         MS. RIMON:  Your Honor, I believe that Craighead put a

4    finer point on a specific factual situation, which was the

5    in-home situation.  I don't think it made new law.  I think it

6    took the Kim factors in mind, which came out of Miranda, and

7    said, well, if you have an in-home situation, we have to look

8    at the inquiry just a little bit different, and so these are

9    factors that are more applicable to an in-home interview.

10        THE COURT:  But why do you think there were no cases

11   before Craighead in which they had to deal with in-home

12   interrogation?

13        MS. RIMON:  I'm just trying to recall whether I saw

14   any prior to Craighead.  I would doubt there aren't any.

15        THE COURT:  I think Craighead makes reference to some

16   cases outside the circuit.

17        My impression may be wrong, but it seems to me that

18   the Craighead court, even though it was one of the more

19   conservative judges on the court who wrote the opinion, did

20   seem to expand the idea of custodial interrogation beyond what

21   other cases had done.

22        Rightly or wrongly, I think that law enforcement may

23   have assumed for the last I guess it's 40 years since Miranda

24   that in order for the Miranda warning to be required, the

25   defendant had to be actually in custody in the way we

1   ordinarily think of it, not in his home, but at the police

2   station or in a jail or someplace like that.  And it seems to

3   me that Craighead expanded that understanding.  I may be

4   wrong.

5        MS. RIMON:  Your Honor, I think the Court, given the

6   law that does exist based on Craighead and the facts that came

7   out during the testimony of the two agents and Mr. Blanford,

8   is well within controlling law, whether that's Craighead only

9   or the cases that come before it that sort of provide the

10  foundation for Craighead, to find that custody did not occur.

11       I think that the facts as the Court has heard them are

12  so drastically different from any of the cases that we've

13  talked about.  The only real issue is whether the agents, not

14  having specifically advised the defendant that he could leave

15  or terminate the interview or ask them to leave, is enough to

16  find that custody occurred.

17       I think that's the only real issue under all of the

18  cases I looked at.  And as I review the cases, that factor

19  alone, whether it happens or doesn't happen, is not by itself

20  a basis for a finding of custody.

21       I think that under the circumstances where we have

22  these other factors of two casually dressed agents who were

23  speaking in calm and conciliatory tones, did not have an

24  extended session of laying out every fact before the defendant

25  that they knew about his crime, and that requests were made,

1   that's the testimony, it's not that demands were made, and you

2   have a defendant that voluntarily thereafter followed the

3   agents, you know, while having an opportunity to speak to his

4   wife and had his phone in his possession, and all of those

5   factors taken together show that custody did not occur.

6           THE COURT:  If the Court were to grant this motion,

7   under the law don't you still have the right to use any

8   statement that he made in cross-examination if he testifies at

9   trial?

10          MS. RIMON:  Yes, Your Honor.

11          But I think -- respectfully, I think that it would be

12  contrary to the law as it exists, contrary to Craighead to

13  make that finding.  I think Craighead went into great detail

14  about the factors that the court looked at in finding custody,

15  and I think they are directly at odds with the facts here.

16          And granted there are district court decisions that

17  have occurred since then, and maybe there will be appeals, but

18  there's enough of them that a general consensus is building

19  and there's some sense of what other courts have found to be,

20  you know, factors that show custody.  And I think that what we

21  have here is different enough that the Court would most

22  appropriately find that custody did not occur.

23          THE COURT:  All right.  Let me hear from -- how do you

24  pronounce your last name?  Is it Rekhi?

25          MS. REKHI:  Yes.

1              THE COURT:  Rekhi, Ms. Rekhi.

2              MS. REKHI:  Good afternoon, Your Honor.

3         Your Honor, what I think -- specifically in Craighead

4    they state that what is a defendant to do when the

5    interrogation is at his own home?  Where is this person

6    supposed to go?  If he leaves his home, where is this person

7    supposed to go?  So I think initially starting off the

8    question is much different than a detention that might take

9    place at a jail or a detention that might take place on the

10   street.

11        Because here when the -- when the defendant is faced

12   with the interrogation, he basically either has the

13   opportunity to leave his residence or tell the agents to leave

14   the residence.  So the question would be what would a

15   reasonable person in that situation feel free to do?

16        With the cases that -- the district court and Court of

17   Appeal cases that I've looked at so far, the primary thing is

18   when the agents arrive, they notify the defendant that you

19   have the right to terminate this questioning, you do not have

20   to cooperate with us, you're not under arrest.  In this

21   situation, the agents arrived at Mr. Blanford's residence with

22   the sole purpose of interrogating him.  They already knew that

23   he was likely to make incriminating statements based upon the

24   pretext calls that had already been conducted.

25        Now, I agree that the Craighead factors are not the

1   only factors that the Court can look at.  And I believe that

2   Kim is also relevant for this because it shows the

3   confrontational nature of the questioning or the interrogation

4   when the agents actually ask Mr. Blanford about Ngo's conduct

5   and show him the complaint against Ngo.

6        Would a reasonable person in that situation feel free

7   that they're not -- feel free to leave?  I absolutely think

8   they will not.  When being confronted of evidence of supposed

9   lies that he himself made or evidence of another person being

10   arrested and being charged with a crime, it definitely will

11   contribute to the situation where the person will feel I'm

12   under arrest, any moment now they're carting me off to jail.

13        THE COURT:  Well, is the question whether he thinks

14   he's under arrest?  What about a detention?  What if he thinks

15   he's detained but not under arrest?  Is he in custody then?

16        MS. REKHI:  If he believes that he's not free to

17   leave, then he is in custody.  If the circumstances show that

18   a person in this situation, a reasonable person would not have

19   felt free to leave, then, yes, he is in custody.

20        There have been cases that have considered an hour to

21   be enough, and I think that's why the length of the

22   interrogation --

23        THE COURT:  Well, couldn't 10 minutes be enough?

24   This is why I ask you about your statement that he would have

25   felt he's under arrest.  That's not the same as being in

1    custody, is it?

2          MS. REKHI:  No, because a person who is not physically

3    handcuffed may still consider themselves to be in custody.

4          THE COURT:  But is that synonymous with being under

5    arrest?

6          MS. REKHI:  The language of being under arrest?  If

7    the person feels free -- that they're not free to leave, then

8    yes.  If the individual, given the circumstances, feels that

9    they cannot either terminate the interrogation or walk away,

10   then they are in custody.

11         THE COURT:  But that doesn't necessarily mean they're

12   under arrest.

13         MS. REKHI:  No.

14         THE COURT:  All right.

15         MS. REKHI:  And looking at the -- Kim also addresses

16   this revolving around the length of the interrogation.  And,

17   again, I believe Agent Sommercamp testified that a

18   conservative estimate was an hour and a half.  In Kim, they

19   considered the length of the questioning and found 45 minutes

20   to be lengthy and found that to be a factor in analyzing

21   whether the defendant in that situation was in custody or not.

22         And in terms of whether being confronted with evidence

23   of guilt, specific instances of guilt, again, Kim weighs in

24   favor of Mr. Blanford because here he is being confronted with

25   these alleged lies and then also the fact that there's a

1   complaint against John Ngo.

2          Now, I understand that the Court inquired whether, you

3   know, the knowledge specific to law is a relevant issue or

4   not, and how do you analyze a person in a reasonable -- what

5   would a reasonable person do?  In Craighead, they actually

6   discuss that the defendant had no prior contact with law

7   enforcement, and that would have been something that weighed

8   in favor of him believing that he was in custody and not free

9   to leave.

10         THE COURT:  Then what is the test?  Is it an objective

11  test or a subjective test?

12         MS. REKHI:  I believe since the -- it is an objective

13  test, but because there was evidence that Mr. -- that the

14  defendant in Craighead had never been in any situation

15  involving law enforcement officers where he would have known

16  his rights, it is reasonable to believe that he would not have

17  felt free to terminate the questioning.

18         THE COURT:  Well, that's an interesting question.

19  Miranda tried to set down a bright line rule for police

20  officers.  If they followed Miranda, any statements made by

21  the defendant would be admissible.  If they didn't follow

22  Miranda, the statements would not.

23         Since Miranda, I would be surprised if there's anybody

24  that isn't just totally out of touch with reality who is

25  unaware of their Miranda rights.  You just have to turn on the

1   television, every night they're talking about Miranda.  Go out

2   on the street, I'll give you a dollar for everybody you can

3   find that doesn't know their Miranda rights, and it's not

4   going to cost me very much.

5        And so the question is not whether they knew their

6   Miranda rights.  The question is did the officer advise them

7   of their Miranda rights?  That's what the Supreme Court wanted

8   to say, and they've made it very clear since then.  The fact

9   that the defendant did or didn't in fact know his Miranda

10  rights is not the question.

11       Am I right or am I wrong?

12       MS. REKHI:  You're correct, Your Honor.

13       THE COURT:  Okay.  So I'm not sure what relevance it

14  has that this defendant or the defendant in Craighead may or

15  may not have actually known what his constitutional rights

16  were.

17       MS. REKHI:  Your Honor, I believe it contributes to

18  the -- to understanding the totality of the circumstances.  If

19  the agents had advised Mr. Blanford right off the bat that

20  you're free to leave or you're free to terminate this

21  questioning, maybe he would have opted to do something

22  different than what happened.  But since it never arose to

23  that point, now we're -- or since the agents never decided to

24  give that information to Mr. Blanford, it is another factor

25  that shows the intent of the agents, that they are there to

1    gather the information.

2            And I understand that it's not solely the intent of

3    the agents, but given how they communicate that to the

4    defendant.  And in this case they do communicate it to Mr.

5    Blanford because Mr. Blanford testified that he was told that

6    he's going to take the fall for all this, that he's going to

7    go to jail, and so forth.  So there are threats being made to

8    him that would make him feel that he is not free to leave and,

9    furthermore, that he doesn't know what his additional rights

10   are.  If he had potentially been made aware or given that

11   option, maybe he would have chosen to exercise those rights.

12           And what I can also say is, in the other cases that

13   have looked at this -- for example, in Krstic, the agents

14   actually contacted the defendant's family, and he had an

15   opportunity to either come out to the police station and have

16   the questioning done there or choose to have the agents arrive

17   at his residence and the time that they would -- that he

18   preferred to have them arrive.  And in that case it shows the

19   exercise of the options given to the defendant.

20           In this case, there's nothing of the sort.  Mr.

21   Blanford is never once advised that he's not under arrest,

22   that he doesn't have to talk to the agents and that he could

23   leave, never once advised.

24           And, again, the court considered those factors in

25   determining that in Krstic the defendant was not in custody

1  because he could have chosen to not conduct the interview, he

2  could have chosen to walk away.  And his family was present

3  during the whole -- the lengthy interrogation.

4          THE COURT:  Do you agree that if the Court grants your

5  motion and your client testifies at trial that the government

6  can still use the statements that he made during the

7  interrogation in cross-examination?

8          MR. CARDOZA:  May I have a second?

9          THE COURT:  Yes.

10         (Defense counsel conferring.)

11         MS. REKHI:  Your Honor, I believe if there is

12 impeachment material, if there is something where there is a

13 direct contrary statement, then, yes, I believe they would get

14 to introduce the statements just to that point only, not the

15 statements as a whole.

16         THE COURT:  Well, maybe, maybe not.  It may not have

17 to be a direct contradiction, but if it's inconsistent, then

18 it may be proper cross-examination.  Do you agree?

19         MS. REKHI:  Just to that topic, yes, not to all the

20 other statements that have been made.

21         THE COURT:  All right.  Well, it's going to be pretty

22 hard for your client to fine-tune his testimony to avoid the

23 issues that he discussed with the officers during that

24 interrogation, isn't it?

25         MS. REKHI:  Your Honor, depending on what the

 1    testimony is that -- unless the -- let me backtrack.

 2         Unless the agents are specifically planning on

 3    testifying to what the defendant says, I don't see how that

 4    would be relevant to -- relevant unless the defendant

 5    testifies to what was said prior to -- prior to any of -- let

 6    me clarify.  Sorry.

 7         THE COURT:  Well, let's just take an example.  Give me

 8    one of the statements that he made during the interrogation

 9    that you want the Court to suppress in this motion.  Just give

10    me an example.

11         MS. REKHI:  The report reads very generally that the

12    defendant admitted to committing fraud.  It doesn't say --

13    there's no specific words that were used to define what the

14    defendant said.  The report generally states that the

15    defendant admitted to committing fraud, and that --

16         THE COURT:  Okay.  So suppose he gets on the stand and

17    says he didn't commit any fraud.

18         MS. REKHI:  I believe that the -- this would

19    definitely be up to the prosecution, but I believe that they

20    can get -- elicit the statements -- elicit other testimony

21    aside from getting into the testimony -- the conduct with the

22    agents.

23         THE COURT:  No, that's -- my question is his

24    statements to the agents.  If they're inconsistent with what

25    he testifies at trial, do you agree that they can ask him on

1    cross-examination whether he made those statements?  And then

2    if he denies that he made those statements, then they can call

3    the officer to say that he did.

4         MS. REKHI:  I may be overthinking this, but I think

5    the question is not whether he made the statements to the

6    agents, but whether he conducted the fraud.  If the question

7    is whether he conducted the fraud, then I don't believe those

8    statements are admissible.

9         However, if he -- if the issue is whether he made any

10   statements admitting the fraud to the agents, then we're back

11   to the Miranda issue, then they do not get to --

12        THE COURT:  Well, you're going to have to research the

13   law, because we're going to get to that point if he testifies.

14   And I'm giving you just a straight hypothetical.  You said one

15   of the statements that you want to suppress is his admission

16   that he committed fraud.  And if he takes the stand here and

17   on cross-examination the U.S. Attorney asks him, Are you

18   telling us that you did not commit fraud in connection with

19   these transactions, and if he says that's what I'm telling

20   you, then the question I have to you is can't they then say,

21   Didn't you tell Agent Fitzpatrick when he was there in your

22   house that you did not commit fraud, or that you -- excuse

23   me -- that you committed fraud?  And if he says, I never told

24   him that, then they can call Mr. Fitzpatrick and have him say

25   what the defendant told him.

1          Now that's my question to you.  If you don't think

2     they can do that, you better be prepared if I grant this

3     motion to address that.

4          MS. REKHI:  Yes, Your Honor.

5          THE COURT:  Because I have a feeling that there's some

6     pretty good case law on that.

7          MS. REKHI:  I would be more than happy to research

8     that.  And --

9          THE COURT:  You sure -- all right.

10          MS. REKHI:  Is there anything else --

11          THE COURT:  Yes.  I would like you to tell me why this

12     motion is timely.  The government has made several references

13     to the fact that you didn't raise this prior to trial.  Rule

14     12(c) provides that motions to suppress should be made --

15     actually shall be made before trial.

16          MS. REKHI:  Your Honor, with that reading it is made

17     prior to trial.  I understand that it might not be the

18     two-week notice requirement.  However, this court does have

19     the discretion to have a hearing on the matter even if it's

20     not within the -- the time frame.

21          And we --

22          THE COURT:  Well, you see, you waited until the trial

23     actually started.  It's not like you didn't bring it two weeks

24     or one week before trial.

25          MS. REKHI:  Your Honor, I did file it a week -- ten

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    days, I believe, prior to the date of trial.

2            THE COURT:  All right.  That may be enough, then.

3            Rule 12(c) says the court may make an order setting a

4    deadline for the parties to make pre-trial motions.  And Rule

5    12(b)(3) says the following must be raised before trial, a

6    motion to suppress evidence.

7            I don't know that I set a date on pre-trial motions,

8    so you're probably okay.

9            MS. REKHI:  Your Honor, just for the record, I did

10   call prior to the trial date to check with Madam Clerk whether

11   the trial date itself would have been appropriate or if I

12   should set another hearing date, and she indicated to me that

13   I should set it on the same -- on for Tuesday, June the 15th

14   or 16th.

15           THE COURT:  One of the reasons that these motions

16   should be made before trial is that if the Court grants the

17   motion, the government can appeal.  I don't know whether that

18   is changed when the motion is made or heard during the process

19   of jury selection but before jeopardy attaches.

20           Do you know what the rule is on that, Ms. Rimon?  If

21   the Court were to grant this motion, would the government have

22   the opportunity to appeal?

23           MS. RIMON:  I believe so, Your Honor.

24           THE COURT:  I know that the government has appealed

25   when I grant motions to suppress in the past, and I wouldn't

1    want the fact that this was brought later rather than earlier

2    to change that right.

3         MS. REKHI:  I believe that the Court has provided both

4    the parties sufficient time to address any concerns the Court

5    may have had.

6         After defense filed their motion, the prosecution did

7    have an opportunity to address whatever concerns they had.

8    And we've been following that path since then in terms of

9    having sufficient time to brief whatever issues the Court

10   needed additional attention for.

11        And I believe that jeopardy has not attached because

12   the venire has not been sworn in.  So --

13        THE COURT:  That's true.

14        MS. REKHI:  So --

15        THE COURT:  Jeopardy has not attached, but it's likely

16   to attach tomorrow.  And I don't know that the government

17   would have the opportunity to make that decision between now

18   and tomorrow.

19        Is there anything else you want to say about the

20   timeliness, Ms. Rimon?

21        MS. RIMON:  Yes, Your Honor.

22        I'd just like to refer the Court to Local Rule 430.1,

23   which requires that pre-trial motions including motions to

24   suppress be filed I believe it's seven days prior to the trial

25   confirmation hearing.  And so that was not in accordance with

1    the filing here.

2         THE COURT:  A problem with that is the use of the term

3    "motion to suppress."  The only place I know where it's used

4    in the rules is in Rule 41(b) that talks about a motion to

5    suppress evidence of an illegal search and seizure.  I don't

6    know the term "motion to suppress" being used in the context

7    of other evidence.

8         For example, suppose there was some attorney-client

9    communication that the defendant objected to.  Would they be

10   required to make that in a motion to suppress?  Any other

11   privileged information -- husband/wife, settlement

12   discussions -- any other privileges, would the defense be

13   required to make those motions one week before trial?  If you

14   want to take it to its logical extreme, objection to hearsay

15   could be called a motion to suppress the hearsay.

16        So I'm not so sure that I could say that the local

17   rule should be applied so strictly.  That's the problem.

18        MS. RIMON:  Your Honor, I'd just say that I think

19   motions to suppress admissions, confessions have generally

20   been treated in the same way as motions to suppress evidence.

21   And in the cases that I've reviewed, it's treated as a

22   pre-trial motion in the same thing.  But the Court's point is

23   well taken.

24        THE COURT:  Right.  Okay.

25        MS. RIMON:  There are a couple other points I'd like

1    to be heard on.

2            THE COURT:  All right.  Were you through there, Ms.

3    Rekhi?

4            MS. REKHI:  Yes, Your Honor.  Is there anything

5    additional that --

6            THE COURT:  No.

7            MS. RIMON:  Briefly, Your Honor.

8            I'd just like to clarify for the record the issue of

9    the length of interrogation.  Agent Sommercamp did testify

10   that it was probably around an hour and a half altogether, but

11   that included the time to drive to Benicia and the call that

12   was placed there.  I think the testimony about the length of

13   the interrogation was closer to about 45 minutes.

14           With respect to the factor relating to whether the

15   defendant was advised that he was free to leave or terminate

16   the interview, the Craighead court had the opportunity to say

17   that is a factor that must be found in order for custody not

18   to have occurred, and it did not.  It found that that was one

19   factor to be considered in conjunction with others as well as

20   factors that may not have even been enumerated.  And so while

21   I do think that's relevant, I don't think it would be correct

22   to hinge an entire decision on that one factor.

23           And with regard to whether an objective or subjective

24   standard applies, I would just point the Court for information

25   to the case of Yarborough versus Alvarado, which is a 2004

1   Supreme Court decision where the Ninth Circuit was overturned

2   on the point of whether the court should look to a

3   petitioner's age and experience as a factor in a Miranda

4   custody inquiry basically holding, again, that it's an

5   objective standard, not based on the subjective views of the

6   officers or the person being questioned.

7          And, finally, I'd just like to point out that the

8   statements that the defendant is seeking to suppress are a

9   significant part of the government's case.  It would have a

10  substantial impact and would not be cured solely by having the

11  opportunity to impeach the defendant should he testify.

12         And so, as I'm sure the Court will, we'd just ask that

13  the Court look at all of the factors and, again, we believe

14  that supports that no custody occurred.

15         MS. REKHI:  Your Honor, for the record I am strongly

16  objecting to that.  That is an improper argument for whether

17  to grant the motion or to deny the motion.  I don't think it's

18  appropriate for the government to argue that their case hinges

19  solely depending on this -- on the statements of the

20  defendant, and I don't believe that's a correct assessment of

21  the case.

22         THE COURT:  It doesn't make any difference.

23         MS. RIMON:  Thank you, Your Honor.

24         THE COURT:  It's either admissible or it's not.

25         All right.  The Court is ready to rule.

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1          Preliminarily I should probably address the question

2    of the timeliness of this motion, although the government has

3    not strongly argued against the motion on the grounds of

4    timeliness.

5          Rule 12(3)(c) does require that a motion to suppress

6    evidence must be made before trial.  And the local rules do

7    have a time limit for motions to suppress requiring that they

8    be filed prior to the trial confirmation hearing.  However, as

9    I have indicated, the term "motion to suppress" is not clearly

10   defined in the rules.  It may be referenced elsewhere, but the

11   only place that I have found it in the rules is in Rule 41(b),

12   which refers to motions to suppress with regard to searches

13   and seizures.

14         This leaves the question open as to whether a motion

15   to exclude or suppress a confession or admission is a motion

16   to suppress within the meaning of Rule 12(c) and the local

17   rules pertaining to motions to suppress.  I think it's

18   sufficiently vague so that a defendant is not clearly on

19   notice that the motion may not be heard unless it is filed one

20   week before the trial confirmation hearing.

21         In this case, the motion was filed before trial, the

22   Court was fully briefed, both sides were given the opportunity

23   to present evidence, and the matter can be reviewed and

24   decided before jeopardy attaches in this case.

25         The reason I make reference to jeopardy is that if the

1    Court rules against the government, it would have serious

2    problems appealing the Court's decision after jeopardy

3    attaches.

4         Having read your briefs and listened to your

5    arguments, I think the Court should first address the Kim

6    factors because that is the general rule as it applied before

7    Craighead and still applies in situations at least where the

8    interrogation is not in the defendant's home.

9         The court in Kim listed five non-exhaustive factors

10   which were relevant to the determination of whether the

11   suspect was in custody for purposes of Miranda.

12        The first factor is the language used to summon the

13   individual.  Here, there is a dispute in a sense in the

14   testimony of the witnesses as to what was said.  Mr. Blanford

15   didn't indicate they said anything.  His testimony was that

16   they simply barged into the home.  The testimony which I think

17   was more credible was the testimony of Mr. Fitzpatrick, that

18   they identified themselves at the door, and Agent Sommercamp

19   stated that he wanted to ask some questions.  The testimony

20   was that the defendant invited them in, but I don't have any

21   recollection if there was any testimony as to the words that

22   were used, so I can only infer that it was some tacit

23   acknowledgement.

24        The next question under Kim is the extent to which the

25   defendant is confronted with evidence of guilt.  Here, the

1    defendant was confronted with substantial evidence of guilt.

2    He was shown the complaint against another individual, and it

3    was suggested to him, if not expressly stated, that he could

4    be charged similarly.  There was also the suggestion, if not

5    express statement, that he could go down for the whole thing

6    unless he cooperated.

7         The third question is the physical surroundings of the

8    interrogation.  That was his home.

9         The fourth question is the duration of the

10   interrogation.  I think the government is correct, the

11   testimony is that it was more like 45 minutes than an hour and

12   a half.

13        And the fifth question is the degree of pressure

14   applied to detain the individual.  I don't know how to answer

15   that question because pressure can be subtle, it can be

16   physical, it can be mental, it can be express, it can be

17   implied.

18        Here I think it was made clear to the defendant that

19   unless he did something, he was going to be charged.  I don't

20   think it was made clear what it was that he had to do in order

21   to avoid being charged.  The testimony is vague as to that,

22   and I think the statements to him were probably deliberately

23   vague as to that because I think the officers were there to

24   obtain admissions, and they were also there to see if they

25   could obtain cooperation.  But I think it was made clear to

1    him that unless something happened, he was going to be

2    charged.

3              Those are the five factors mentioned in Kim.

4              There are other factors, but I think, as the

5    government points out, they're more properly addressed in the

6    context of Craighead.

7              The ultimate question, however, under Kim was whether

8    a reasonable person would have believed he could freely walk

9    away from the interrogation.  To put that more appropriate in

10   the context of an in-home interrogation, I think the question

11   would be whether a reasonable person would have believed that

12   he could freely terminate the interrogation or that he could

13   freely order the officers to leave his home.

14             I'm inclined to cite Chief Judge Kozinski in an

15   article that I just read in the paper discussing a speech that

16   he made.  I don't have the article before me, but he made

17   reference to the fact that judges, although they're not

18   educated on every subject, have no hesitance to express

19   opinions authoritatively on every subject.

20             This is one those subjects, whether a reasonable

21   person would have believed that he could instruct the officers

22   to leave or that he could tell the officers not to interrogate

23   him.

24             Judges are probably the least capable and competent of

25   answering that question.  We don't come to this office from

1    the ranks of the average person.  We start off as lawyers.  We

2    associate with other lawyers who are more educated in the law

3    and more educated as to their rights vis-a-vis law

4    enforcement.  We're then appointed to the court where we

5    become almost totally isolated from the rest of society.

6    We're prohibited by the ethics imposed by Congress and by the

7    rules of conduct imposed by ourselves from interacting with

8    the public in a number of ways.  And then we're asked to make

9    a determination as to what a reasonable person would believe,

10   not a judge or a lawyer.  And judges do that authoritatively

11   as if we have the answers to these questions.

12        This is one of the two most important questions the

13   Court has to answer on this motion.  The government has

14   suggested that I'm free to do some introspection and to ask

15   what I would believe under the circumstances.  Well, I would

16   probably know that I had the right to counsel, and I would

17   probably know that I have the right not to answer their

18   questions, but that's only because I am a lawyer and a judge.

19   If I wasn't, I would probably know what I see on television,

20   which is the Miranda warning.

21        But, given that, I have to tell you that I wouldn't

22   think I was free not to answer their questions.  I just

23   wouldn't.  If they came to my house and told me they were

24   doing a background check on somebody that I knew who had

25   applied for a government job, I think I would probably feel

1  free to tell them, look, I'm busy right now, I'm getting ready

2  to eat, I have some other things going, can I talk to you

3  later?

4       Even if they were coming to ask me about a case they

5  were working on that didn't involve me, I might -- I emphasize

6  might -- feel free to suggest to them that they do it at

7  another time, but I don't know that I really would.

8       However, when they came to his house, they weren't

9  asking him about somebody else, they weren't doing a

10  background check on anybody.  The questions were clear, and

11  the subject was clear.  They were there to question him about

12  his involvement in allegedly criminal activity.  And to be

13  honest with you, I don't think that I would feel free to tell

14  them no, I just don't.

15       Now, that's not the question.  The question is not me,

16  the question is the reasonable person.  And I have taught this

17  in classes that I have given in law school.  The reasonable

18  person is not the most timid, the reasonable person is not the

19  most brazen, the reasonable person is somewhere in between.

20       Here, the most timid person clearly would not feel

21  free to terminate the interview.  As a matter of fact, the

22  most timid person probably wouldn't feel free to terminate the

23  interview if they were asking about a background check.  On

24  the other hand, the most brazen would probably tell them where

25  to get off under any circumstances.

1    But the reasonable person, to the extent that I can

2    try to put myself in the shoes of that person, I think would

3    feel as I have indicated.  When the questioning is about him,

4    when it's accusatory, when they're showing him the complaint

5    against somebody else and suggesting that he could be charged

6    with the same thing, they want to ask him some questions, I

7    just don't think that I would feel free to tell them no.  I

8    could be wrong.  We'll let the judges on the Ninth Circuit, if

9    this matter goes to the Ninth Circuit, tell me what they

10   think.  This is just my view.

11   Now, the next question the Court has to address is the

12   Craighead question.  And the ultimate question under Craighead

13   is whether the circumstances of the interrogation turned the

14   otherwise comfortable, familiar surroundings of the home into

15   a police-dominated atmosphere, and there the court gives us

16   four other non-exhaustive factors.

17   To answer those, the first question is the number of

18   law enforcement personnel.  Here, that is two.

19   The next question is whether they were armed.  The

20   answer is yes.

21   The next question is whether the suspect was at any

22   point restrained either by physical force or by threats.  The

23   answer is that he was not restrained by physical force.  He

24   was not restrained by overt threats.  However, I believe the

25   testimony that he was told that he would go down for the whole

1    thing unless he cooperated.

2          The reason I believe that is not because Mr. Blanford

3    said so, but because Mr. Fitzpatrick and Mr. Sommercamp didn't

4    really remember exactly what they said, and that kind of a

5    statement is entirely consistent with good interrogation

6    practice.  It is probably taught in the academy.  There's

7    nothing wrong with it.  So I believe that that is probably

8    what Mr. Blanford was told and, if he was, that is a form of

9    threat.  Not an improper threat, but a form of threat.

10         The next question is whether the suspect was isolated

11   from others.  Now, here he was not taken into the back room.

12   He was not taken into the storage shed.  He was not removed to

13   the garage.  He remained in his home.  He was not isolated by

14   the officers directly.  But indirectly the tone of the

15   interrogation, the context of it and the content of the

16   questions suggested to Mr. Blanford that he should exclude his

17   wife from the conversation because, in his words, he was in

18   trouble.

19         Now, that was his decision admittedly, but it was not

20   an unreasonable decision.  I would not want my wife present

21   when I was being accused of a crime.  I might want her present

22   at my confirmation hearing, although I didn't want her present

23   at that either because I didn't know whether I'd be accused of

24   something at my confirmation hearing.  I say that simply to

25   illustrate the fact that it is not unreasonable for Mr.

1    Blanford to think it appropriate to exclude his wife when the

2    questioning becomes confrontational and it appears that he's

3    being accused of a crime.  And so, in fact, de facto he was

4    isolated.

5         The next question is whether the suspect was informed

6    that he was free to leave or terminate the interview.  And the

7    answer to that question is, no, he was not.

8         And then the final question is the context in which

9    such statements were made.

10        Again, it's fact specific.  But if the question is

11   whether the circumstances of the interrogation turned the

12   otherwise comfortable and familiar surroundings of the home

13   into a police-dominated atmosphere, I have to conclude that

14   the surroundings of his home were no longer comfortable by any

15   definition.

16        There were only two officers present, but they

17   outnumbered him.  Who dominated that conversation?  They

18   dominated the conversation.  They asked the questions.  He

19   answered the questions.  They controlled the conversation.

20        This isn't like a number of the other cases that

21   you've cited that other district judges have considered.  And

22   some of those district judges probably would not have reached

23   the result I'm going to reach.  But I don't have any more

24   guidance from the circuit than the Craighead and Kim cases.

25   And the other district judges' opinions are certainly

1    respected, but not binding on this court.

2            I have to conclude that these were no longer

3    comfortable and familiar surroundings.

4            When you look at all the things that someone would do

5    in their home -- they might read a book, they might watch

6    television, they might lie on the couch and rest, they may

7    have a bite to eat, they may talk to their wife about the

8    day's events -- I don't think that Mr. Blanford could have at

9    all felt free to do any of those things in his home.  The

10   proceedings were dominated by the two law enforcement

11   officers.

12           So I find that he was in custody within the meaning of

13   Kim and Craighead.  However, I do not find that any of the

14   statements that he made were involuntary or coerced.  To the

15   extent that Mr. Blanford's testimony disagrees with the

16   testimony of the two officers, I find their testimony more

17   credible in every respect.  I find that his statements were

18   voluntary as that term is used and that any admissions were

19   not coerced.

20           There's a difference in the law between an involuntary

21   confession and a confession obtained in violation of Miranda.

22   Any statements made by Mr. Blanford during that interview were

23   not involuntary.  They were voluntary.  They were simply in

24   violation of Miranda as that has been redefined by the Ninth

25   Circuit in Craighead.

1           So that's my findings.  Those are my findings.

2           Now, I think the government probably has the right to

3      appeal.  I don't know if you can make that decision now.  But

4      if you want me to delay in swearing the jury tomorrow to give

5      you the opportunity as much as we can to make that

6      determination, I will do that.  We just need to keep on

7      schedule, so I think at the very latest, if we get through the

8      voir dire process tomorrow, the very latest I could swear the

9      jury would be the following morning.

10          Anything else?

11          MR. CARDOZA:  Not on our behalf.  Thank you.

12          MS. RIMON:  No, Your Honor.  Thanks.

13          THE COURT:  All right.

14          MR. CARDOZA:  Tomorrow at 9:00 o'clock?

15          THE COURT:  Yes, as per the previously agreed upon

16     schedule.

17          MR. CARDOZA:  Very good.

18              (Proceedings were adjourned at 3:30 p.m.)

19                       ---o0o---

20

21

22

23

24

25

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3

4
                              /s/ Kathy L. Swinhart
5                             KATHY L. SWINHART, CSR #10150

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25